**UNITED STATES of America, Appellee,**

**v.**

**Rene SPIROPOULOS, Appellant.**

**No. 91–6058.**

United States Court of Appeals, Third Circuit.

Argued May 4, 1992.

Decided Sept. 25, 1992.

Michael Chertoff, U.S. Atty., Eric L. Muller (argued), Edna B. Axelrod, Office of the U.S. Atty., Newark, N.J., for appellee.

James D. Fornari, Richard M. Zuckerman (argued), Solomon & Fornari, P.C., New York City, Peter Goldberger, Philadelphia, Pa., for appellant.

Before BECKER, NYGAARD, and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal from a judgment in a criminal case requires us to address several interesting and important questions arising under the Sentencing Reform Act and the Sentencing Guidelines.

Defendant Rene Spiropoulos entered into a plea agreement with the government that required him to cooperate in the investigation of individuals who had committed offenses related to his. The Agreement obligated the government, in exchange, to file a motion pursuant to U.S.S.G. § 5K1.1, requesting a downward departure from the Guidelines sentencing range based on Spi-ropoulos's good-faith effort to assist the government. After Spiropoulos fulfilled his obligations under the Plea Agreement, the government moved for a downward departure pursuant to section 5K1.1. The district court granted the motion but tempered the extent of the requested downward departure because, by mere happenstance, the defendant's cooperation bore considerably less fruit than had been expected. The first question we must answer is whether the fruitlessness of a defendant's good-faith cooperation constitutes a legally permissible consideration in determining the amount of downward departure under section 5K1.1. We conclude that it does.

Spiropoulos also contends that he is entitled to resentencing because the district court, during a highly charged sentencing hearing, described his conduct as malicious and avaricious. We must determine whether the district court's use of this characterization, which was in large part unjustified, deprived Spiropoulos of due process and requires his resentencing. For reasons that follow, we conclude that there was no due process violation.

Finally, the district court directed Spiropoulos to pay a fine based in part on the cost of his imprisonment as provided for in U.S.S.G. § 5E1.2(i). Spiropoulos contends that requiring a defendant to pay the costs of his imprisonment is not authorized by the Sentencing Reform Act and is inconsistent with the Due Process Clause of the Fifth Amendment. Spiropoulos's contentions raise a number of intricate and difficult questions of construction and application of the Act, which we will discuss at length. Because we believe that the assessment of fines under section 5E1.2(i) is inconsistent with the Act as presently drafted, we will invalidate section 5E1.2(i) and vacate that portion of the fine against Spiropoulos, leaving it to Congress to make provision for such fines if it so desires.

## I. FACTS AND PROCEDURAL HISTORY

Spiropoulos was a real estate developer involved in the multi-year construction of a

large development in a New Jersey township. Before constructing each subdivision, Spiropoulos was required to obtain a building permit, which the township generally granted as a matter of course. Beginning in 1985, however, the township's corrupt mayor forced Spiropoulos to pay bribes totalling more than $200,000 to obtain a subdivision permit. Howard Boswell, a consulting engineer for the township, solicited the bribes on the mayor's behalf. Although Spiropoulos paid the bribes, he neither sought, nor was he granted, anything to which he was not legitimately entitled in exchange for the bribes.

After the government had uncovered the bribery scheme, Spiropoulos entered into the Plea Agreement, in which the government promised to move for a downward departure pursuant to section 5K1.1 in exchange for Spiropoulos's cooperation. Additionally, Spiropoulos pled guilty to two counts of conspiracy, see 18 U.S.C.A. § 371 (West, 1966 and 1992 Supp.): 1) conspiracy to violate 18 U.S.C.A. § 666 (West, 1992 Supp.) by the payment of bribes; and 2) conspiracy to violate 26 U.S.C.A. § 7201 (West, 1989 and 1992 Supp.) by enabling the mayor to evade income taxes due on those bribes. Spiropoulos cooperated both by providing the government with information and by participating in the investigation. Specifically, Spiropoulos wore a "wire" on three occasions to monitor his meetings with others involved in the scheme, including a meeting with Boswell. The wire recorded Boswell's statements acknowledging that he had solicited bribes on behalf of the mayor. After listening to the tape, an FBI agent told Spiropoulos that he had "hit a homerun."

The evidence that Spiropoulos had helped the government to obtain did not prove as valuable to the government as anticipated, however, because Boswell died while the government was investigating him. Consequently, much of the evidence that Spiropoulos had helped accumulate was ultimately useless. Nevertheless, because of his cooperation and his fidelity to the Plea Agreement, the government moved pursuant to section 5K1.1 for a downward departure from the Guideline sentencing range. The Guideline range set forth in the Presentence Investigation Report was 21 to 27 months imprisonment, and a fine of between $5,000 and $50,000. The government recommended a sentence within the range of 10½ to 13½ months, or half the guideline range. The government made no reference to whether any fine was appropriate or to the amount of a possible fine.

At sentencing, Spiropoulos's counsel maintained that the degree of downward departure must be gauged by what defendant did to assist the government and not by whether, for reasons beyond his control, the government successfully prosecuted others based on information he had given them.[1] Counsel also stressed that Spiropoulos had sought nothing from the bribes, but rather was paying for that to which he was lawfully entitled. Based on these arguments, defense counsel contended that Spiropoulos was entitled to avoid imprisonment completely and recommended that he be sentenced to probation.

The court granted the section 5K1.1 motion but made clear that Spiropoulos's sentence would be decreased less than it would have if Boswell had lived, and Spiropoulos's cooperation had borne more fruit:

> Many times individuals want to cooperate, they're not able to cooperate and the argument is made that they should be given consideration because they would want to do so if they could do so, but because of circumstances, they can't.

> A spin of that argument is offered here, that although there was participation with regard to the investigation concerning Boswell, his death very close on the heels of the investigation prevented fur-

---

1. At sentencing, defense counsel also advanced the following theories as bases for adjusting the sentence downward: that bribing the mayor was not Spiropoulos's idea; that Spiropoulos was physically intimidated into the arrangement; that Spiropoulos had an elderly mother to care for; and that Spiropoulos's illegal payments had caused less harm than would a conventional bribe. The district court did not depart or adjust the base offense level based on any of these factors, and Spiropoulos does not raise any of them on appeal.

ther assistance by the defendant. Also, the defendant attempted on at least one other instance to assist the Government. This cannot be ignored. Cooperation is very important, it is something that has to be taken into consideration.

On the other hand, I'm not sure I buy, Mr. Fornari, all of your argument, that the ultimate result should not be considered. That's a spin of the prior argument that many defendants make. We'd like to cooperate, we just don't have the goods, but if we did, we'd give them to you. So I appreciate what you have both said there, to project out what would happen had Boswell lived. It is nothing more than speculation and has no place in this.

The court continued:

I recognize your cooperation, your attempt to cooperate. I recognize nothing came to fruition, but that in itself was not because of you, but because of the death that followed so quickly of Mr. Boswell. Whether anything would have come from that, I don't know, but I agree with the Government, that cannot be ignored. Your attempt to cooperate cannot be ignored. Indeed, much of this crime would not come to light were it not for individuals who cooperated with the Government.

During the course of its sentencing statement, the district court also responded to defense counsel's arguments regarding mitigation. It stated:

Your submissions argue, your attorney argues that you received nothing more than what was due to you and accepting that, my observation is: You obtained a lawful result through unlawful means. That is not acceptable sir. That's corrupt and it's criminal in the fullest and most complete sense of those words.

Your corrupt conduct was highly criminal, malicious, driven by avarice.

The government concedes that there was no factual basis to support a finding that Spiropoulos's conduct was "malicious." It seeks to justify the statement about "avarice" as being judgmental rather than fac-

tual. The PSI did not describe defendant's conduct as either malicious or avaricious.

The district court imposed a sentence of 14 months' incarceration concurrently on both counts, two years' supervised release, and a fine of $50,000. Thus, with respect to the term of incarceration, the district court departed downward by one-third from the 21-month lower end of the guidelines, rather than by one-half, as the government had recommended. With respect to the fine, the court imposed a fine at the high end of the guideline range. In addition to the $50,000 fine, the district court directed that Spiropoulos pay, as an additional fine reflecting the costs of incarceration:

Second, you will pay the cost of your incarceration of $1,115.56 per month as an additional fine.

Following disclosure of clerical errors in the judgment the district court entered an Order Correcting Judgment, which clarified the direction to pay costs of incarceration:

ORDERED, that the sentence in the Judgment reading: "The defendant shall pay a fine of $69,817.84," shall be corrected to read: "The defendant shall pay a fine of $65,617.84." This amount reflects the $50,000.00 fine imposed on defendant and a charge of $1,115.56 per month for the fourteen months of incarceration defendant is to serve; and it is further

ORDERED, that if defendant is eligible for credit toward the service of his sentence pursuant to 18 U.S.C. § 3624(b), then the charge of $1,115.56 per month to pay for defendant's incarceration will be reduced accordingly.

Spiropoulos now appeals from the judgment. We have appellate jurisdiction under 28 U.S.C.A. § 1291 (West, 1966 and West Supp.1992) and 18 U.S.C.A. § 3742(a) (West, 1985 and 1992 Supp.).

## II. DEPARTURE BASED ON SUBSTANTIAL ASSISTANCE

■ Spiropoulos contends that the district court applied an improper legal standard in determining the degree of downward departure when it imposed a harsher

sentence on him than it would have imposed had Boswell's death not caused the investigation to cease. He submits that the Sentencing Reform Act, the Guidelines, and the Plea Agreement all make clear that downward departures based on substantial assistance should be gauged by whether defendant made a good-faith effort to provide substantial assistance to the government, and not by whether that cooperation resulted in the successful prosecution of others.[2] Spiropoulos urges that altering the amount of the departure based on the success of subsequent prosecutions is, therefore, inconsistent with the Act, the Guidelines, and the Plea Agreement.

Our analysis begins with the Sentencing Reform Act, which created the Sentencing Commission and contains the basic charter for the Guidelines. The Act provides:

> (n) The Commission shall assure that the guidelines reflect the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.

28 U.S.C.A. § 994(n) (West, 1992 Supp.).

The Act thus says no more than that the Commission shall take into account defendant's substantial assistance in the investigation or prosecution of another in crafting the Guidelines. In charging the Commission to establish the standards for "the general appropriateness of imposing a lower sentence than would otherwise be imposed," the Act leaves to the Commission the task of defining the appropriate method for calculating the amount of downward departure when a defendant provides substantial assistance.

In response to the statutory command of section 994(n), the Sentencing Commission promulgated U.S.S.G. § 5K1.1. In its 1987 form, which applies to the sentencing of Spiropoulos,[3] the Commission provided the following system for calculating downward departures based on substantial assistance:

> 5K1.1. *Substantial Assistance to Authorities* (Policy Statement)
>
> Upon motion of the government stating that the *defendant has made a good faith effort to provide substantial assistance in the investigation or prosecution of another person* who has committed an offense, the court may depart from the guidelines.
>
> (a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following conduct:
>
> (1) the court's evaluation of *the significance and usefulness of the defendant's assistance,* taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) *the nature and extent of the defendant's assistance;*
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

---

**2.** The government asserts that we have no jurisdiction to review the district court's downward departure because of our previous holdings that appellate courts lack jurisdiction over discretionary refusals to depart downward, see *United States v. Denardi,* 892 F.2d 269, 272 (3d Cir. 1989) or over challenges to the extent of downward departure, see *United States v. Parker,* 902 F.2d 221, 222. (3d Cir.1990). We disagree. Instead, we view Spiropoulos as alleging that the sentence was imposed either based on a mistake of law or as the result of an incorrect application of the Sentencing Guidelines, see 18 U.S.C.A. § 742(a)(1) and (2). We have appellate jurisdiction to review such a claim under a plenary standard. See *United States v. Cheape,* 889 F.2d 477, 479–81 (3d Cir.1989).

**3.** The district court was required to apply the guidelines governing at the time Spiropoulos committed his offense rather than those governing at the time of sentencing because district courts are required to apply the time-of-offense guidelines rather than the time-of-sentence guidelines when, as here, the time-of-offense guidelines are more favorable to the defendant. See *United States v. Barel,* 939 F.2d 26, 43 (3d Cir.1991).

(5) the timeliness of the defendant's assistance.

(emphasis added).

The Plea Agreement reached between Spiropoulos and the government largely tracked the language of section 5K1.1 and the Act:

Further, if Rene Spiropoulos fully complies with this agreement and *makes a good-faith effort* prior to his sentencing to provide substantial assistance in *the investigation or prosecution of one or more other persons* who have committed offenses, the United States will, at the time of sentencing; (i) move the sentencing Court pursuant to Title 18, United States Code, Section 3553(e) to impose a sentence lower than what the Court has determined to be the otherwise applicable minimum sentence: and (ii) recommend that, in the event that the Court declines to depart from the applicable guideline range, the Court impose such minimum sentence.

(emphasis added).

In pursuing his argument that the subsequent success of an investigation or prosecution should be irrelevant in calculating the amount of a downward departure, Spiropoulos first focuses on the language of the Guidelines. He argues that a defendant's substantial assistance should be judged based upon his making a "good-faith effort" to provide assistance in "the *investigation or* prosecution" of others. Spiropoulos submits that the Act and Guidelines therefore render irrelevant whether the assistance results in prosecutions (let alone successful prosecutions) and, that assistance to *investigations* should yield the same downward departure that assistance to a successful prosecution would yield.

■ We reject Spiropoulos's contention as inconsistent with the Act and the Guidelines. As we have suggested, the Act makes clear that the Commission should define the specific method for determining the extent of a departure below the minimum sentence. The Guidelines, in turn, specify that a sentencing court, in determining the extent of a downward depar-

ture, may consider its evaluation of "the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered...." U.S.S.G. § 5K1.1. That section therefore makes crystal clear that, in determining the extent of a substantial assistance departure, a court should examine the "usefulness" of the defendant's cooperation. Obviously, a defendant's assistance is generally more "useful" if it leads to a conviction than if the government never uses the information once it is acquired.

Further, the Guidelines specify that the court is specifically obligated to consider the government's evaluation of the usefulness of that testimony, which the government provided in this instance. Spiropoulos is therefore simply incorrect when he argues that the Guidelines focus solely on the defendant's conduct in assisting the government, and we hold that it was consistent with the Act and the Guidelines for the district court to temper the extent of its downward departure because the defendant's cooperation proved unhelpful to the government.

■ The Plea Agreement refers only to defendant's "good-faith" efforts to render substantial assistance as the trigger for the section 5K1.1 motion. Spiropoulos alleges that it was a breach of the Plea Agreement for the government to urge the district court to downgrade the value of Spiropoulos's cooperation simply because no convictions resulted from his cooperation. He thus seeks specific enforcement of the Plea Agreement, which, in his submission, entitles him to have his cooperation judged by his good faith efforts alone.

We do not believe that the government breached the Plea Agreement when it mentioned in its motion under section 5K1.1 of the Guidelines that the defendant's cooperation had not ultimately been useful. We note at the outset that the Agreement did no more than to require the government to make a section 5K1.1 motion, which it did. Specifically, the government agreed to move for a downward departure if defendant "ma[de] a good-faith effort prior to

his sentencing to provide substantial assistance." Defendant made such an effort, and the government fully lived up to its bargain when it moved for a departure down to half of the guideline range.

Spiropoulos suggests that the government's report to the district court on the usefulness of his cooperation was a breach of the Agreement. Nothing in the Agreement, however, restricted the kinds of information that the government could share with the district court on the subject of defendant's cooperation. Rather, the Agreement explicitly reserved to the government the right to

> inform the sentencing Judge ... of ... the full nature and extent of Rene Spiropoulos's cooperation and the date when such cooperation commenced; and all other information, favorable or otherwise, in the possession of this Office relevant to sentence.

Moreover, the government never promised to hide from the district court the usefulness (or lack thereof) of defendant's efforts. The government, therefore, fully complied with its obligations under the Agreement, and the district court's decision not to grant a more extensive downward departure does not demonstrate a breach of that agreement.

Spiropoulos does not confine his argument to the language of the Act, the Guidelines, and the Plea Agreement, however. He also argues that the policy considerations which inform our interpretation of the guidelines suggest that if defendants are to be encouraged to cooperate, they must be assured that their cooperation will be rewarded, and that the benefits of their cooperation will not be denied or diminished by fortuitous events beyond their control.[4]

We believe that this argument proves far too much. If Spiropoulos were correct, every cooperating defendant would be entitled to an identical departure, and a defendant whose good-faith efforts led to the apprehension of an international drug lord or local "kingpin" would be entitled to no greater departure than a defendant whose good-faith efforts led to the apprehension of a low-level courier—or even to the apprehension of no one at all. That would represent unwise sentencing policy, and we reject it as an unreasonable interpretation of section 5K1.1.

Additionally, Spiropoulos's argument assumes that defendants will only cooperate if they will receive the maximum departure that any cooperating witness could receive. Logic does not support that assumption. Even if a defendant knew that he or she would not receive the *maximum* downward departure, the defendant might still cooperate in order to receive *some* downward departure. We therefore do not believe that policy considerations mandate the result that Spiropoulos urges.

We do emphasize, however, that cooperation need not result in a prosecution or conviction to justify a large downward departure. In some cases, assistance to an investigation may be sufficient in and of itself. The critical point is that the Guidelines preserve the discretion of the district court with respect to the extent of section 5K1.1 departures. When the defendant's cooperation yields substantial or, perhaps, spectacular results, (for example, the aforementioned arrest of a drug kingpin), the court may reward the defendant, even if the results in significant part came from blind luck. Alternatively, the district court may choose to reward cooperation that does not lead to a conviction or prosecution but represents a sincere effort by the defendant to advance the government's investigation.

If the district court here, for example, had decided to confer a larger downward departure on Spiropoulos despite Boswell's untimely death, that decision would have been well within the court's discretion, regardless of the government's objection.

---

4. As a corollary, Spiropoulos contends that measuring cooperation solely on the basis of a defendant's good-faith efforts also promotes the cooperating defendant's truthfulness, and minimizes the possibility that a cooperating defendant's testimony in the prosecution of another may be subject to impeachment on the grounds that the cooperating defendant has a contingent interest in a conviction.

Having set the section 5K1.1 downward departure process in motion, the government cannot dictate the extent to which the court will depart. See, for example, *United States v. Paden*, 908 F.2d 1229, 1234 (5th Cir.1990) (recognizing that a district court can depart more than the government recommends).[5] This is one area in which the Act and the Guidelines preserve district court discretion, and we see no warrant for diluting it. We are therefore satisfied that policy considerations do not require reversal of the district court's sentence on this ground.

In sum, we believe that the district court applied the proper legal standard with regard to the downward departure, hence its exercise of discretion in this instance was appropriate under the Guidelines.

### III. THE RULE 32 AND DUE PROCESS CLAIMS

Spiropoulos maintains that imposition of his sentence violated Federal Rule of Criminal Procedure 32 and his due process rights because the district court relied upon false information—that Spiropoulos was "malicious" and "driven by avarice"—in imposing his sentence.[6] We find this argument meritless.[7]

Initially, we hold that Rule 32 is not implicated in this case because there was no factually inaccurate statement in the presentence investigation report that defendant challenged or on which the district court relied. By its plain terms, Rule 32 only deals with such inaccuracies in the

presentence investigation report. Therefore, if Spiropoulos has a claim, it must fall under the rubric of due process.

We have held that the test to evaluate whether a sentence has been based on criteria violative of a defendant's due process right is two-fold: "(1) [H]as misinformation of a constitutional magnitude been given to the district court; and (2) has that misinformation been given specific consideration by the sentencing judge?" *United States v. Matthews*, 773 F.2d 48, 51 (3d Cir.1985). In order to make out a due process claim, a defendant must show that the district court relied upon some significant piece of "misinformation." Id.

We see no due process violation here. Although the description of defendant as avaricious might not fully and accurately describe defendant's conduct, neither can we state that the normative judgment that the payment of a bribe, compromising the integrity of a township's mayor in order to protect one's private interest, is not "avarice." And while we cannot fairly say that defendant's conduct was "malicious," neither can we hold judges to standards of linguistic perfection, especially in the setting of remarks from the bench in the crucible of a highly charged sentencing hearing. Further, although the court's statement was arguably a mischaracterization, it was not the result of any identifiable "misinformation," as required by *Matthews*. Finally, even if the district court's characterization was inaccurate, there is

---

5. We recognize that the Application Notes to the substantial assistance guideline provide that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain." See U.S.S.G. § 5K1.1, App. Note 3. We read this Application Note as requiring deference to the government's position on the underlying facts concerning the amount and quality of assistance provided by a defendant, lest the court seek to inquire too intrusively into the government's file. The Application Note does not suggest that a district court should give substantial weight or defer to the government's recommendation about the extent of downward departure. The guideline itself, in stating that the "[t]he appropriate reduction shall be deter-

mined by the court," makes clear that the decision is a discretionary one for the district court.

6. Rule 32(c)(3)(D) provides:
   If the comments of the defendant and the defendant's counsel ... allege any factual inaccuracy in the presentence investigation report ..., the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.
   F.R.Cr.P. 32(c)(3)(D).

7. The government challenges our appellate jurisdiction over this claim as well, but we reject that contention for the reasons expressed in note 3.

not the slightest indication in the record that the district court would view the matter differently if we held that it was error to so characterize defendant's conduct. We therefore find no due process violation merely on the basis of the court's inaccurate characterization of the defendant's conduct.

## IV. THE VALIDITY OF THE § 5E1.2(i) FINE FOR COSTS OF INCARCERATION

### A. *Introduction*

Spiropoulos objects to the imposition of a fine against him under U.S.S.G. § 5E1.2(i) on statutory and constitutional grounds. Section 5E1.2(i) provides:

Notwithstanding of the provisions of subsection (c) of this section, but subject to the provisions of subsection (f) herein, the court shall impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered.

Although the language of section 5E1.2(i) suggests otherwise, fines collected under it do not, in fact, go to pay for the costs of a defendant's incarceration. Rather, the monies from section 5E1.2(i) fines are paid into a fund called the Crime Victims Fund, as required by 42 U.S.C.A. § 10601(a) and (b)(1) (West, 1992 Supp.):

**8.** The background note to the original section 5E1.2(i), then numbered as 5E4.2(i), noted that all funds collected under that section would be paid into the Crime Victims Fund. See U.S.S.G. § 5E4.2, Background Note (January 15, 1988) ("With few restrictions, 42 U.S.C. § 10601(b) and (c) authorize fine payments up to $100 million to be paid into the Crime Victims Fund in the United States Treasury.").

**9.** Spiropoulos also argues that section 5E1.2(i) is inconsistent with 18 U.S.C.A. § 3553(a), which requires that criminal sentences imposed under the guidelines must be "sufficient, *but not greater than necessary,* to comply" with the purposes of the Act. (emphasis added). He notes that U.S.S.G. § 5E1.2(c)(3) provides a table of fines and submits that the fine amounts contained in that table are the amounts sufficient to achieve all of the Act's purposes. Hence, Spiropoulos

(a) Establishment

There is created in the Treasury a separate account to be known as the Crime Victims Fund

. . . .

(b) Fines deposited in fund; penalties; forfeited appearance bonds

Except as limited by subsection (c) of this section, there shall be deposited in the Fund—

(1) all fines that are collected from persons convicted of offenses against the United States except [for irrelevant exceptions].

The Crime Victims Fund, which is separate from the General Treasury, provides grants to state programs for crime victim compensation, assistance, and restitution. See 42 U.S.C.A. §§ 10602, 10603 (West, 1992 Supp.).[8]

█ Spiropoulos argues that the guideline and fines assessed under it are invalid because the Sentencing Reform Act, which provides the charter for the Guidelines, does not authorize assessment of a fine to recoup to the government the cost of incarcerating defendants. The government responds that the purpose of the guideline is not actually to compensate the government for the cost of incarcerating defendants, but rather is to provide restitution to crime victims, which the government claims is a valid purpose of the Act. Spiropoulos rejoins that even if the guideline is designed to provide restitution, it is invalid because the guideline's method of calculating appropriate restitution is irrational and hence inconsistent with due process.[9] We must

concludes, the fines authorized by section 5E1.2(i) are "greater than necessary" to effectuate the Act's purposes and therefore inconsistent with the statute.

We do not agree that the fines provided for in section 5E1.2(c)(3) perfectly reflect the amount required to effectuate all of the purposes of the Act. Additional fines are permissible, provided there is authorization for those fines in the Act. An example of a permissible additional financial penalty is the restitutionary orders provided for in section 5E1.1. Although those orders, in some cases, supplement the fines of section 5E1.2(c)(3), they do not result in fines "greater than necessary to effectuate the purposes of the Act," because restitution is a specific goal of the Act, which that guideline adequately serves. Therefore, if we were to decide that section 5E1.2(i) fines are authorized by the Act, we would have no difficulty concluding that they

first consider whether there is any authorization in the Act for the government to recoup the costs of imprisonment. Then, we must decide whether, if the guideline is purely a means of effectuating restitution, it is sufficiently rational to satisfy the requirements of the Due Process Clause of the Fifth Amendment.

Two provisions of the Sentencing Reform Act possibly provide authorization for the Commission's promulgation of section 5E1.2(i). First, 18 U.S.C.A. § 3553(a) (West, 1985 and 1992 Supp.) sets forth the purposes a sentencing court should consider in sentencing a defendant:

... The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

....

(7) the need to provide restitution to any victims of the offense.

Second, 18 U.S.C.A. § 3572(a) (West, 1992 Supp.) details the factors that district courts must consider in determining whether to impose a fine:

In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—

(1) the defendant's income, earning capacity, and financial resources;

are not excessive simply because a defendant is

(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) whether the defendant can pass on to consumers or other persons the expense of the fine; and

(7) if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

### B. *Is Payment of the Costs of Imprisonment a Valid Basis for Imposition of a Fine?*

■ We conclude that the Act does not authorize the assessment of a fine to pay for the costs of a defendant's imprisonment. Certainly, there is no specific reference in the statute to recouping the costs of imprisonment as an appropriate goal of sentencing. Nor do we believe that assessing fines for that purpose is subsumed within the more general provisions of the Act. Recouping the costs of imprisonment has nothing to do with the nature or the seriousness of the offense, and hence is not authorized under section 3553(a)(1) or 3553(a)(2)(A). Further, there is no reason to believe that assessing the costs of imprisonment (in addition to other fines) deters criminal conduct, that it protects the public from further crimes of the particular defendant, or that it helps to rehabilitate the defendant. See 18 U.S.C.A.

also assessed a section 5E1.2(c)(3) fine.

§§ 3553(a)(2)(B), (C) and (D). At least, the government has presented no evidence suggesting that a section 5E1.2(i) fine serves any of these purposes, and we see no reason why it would.

That the current Act does not authorize a fine to be actually used for the payment of the costs of incarceration is further demonstrated by the Act's authorization of the Commission only to "*study* the feasibility of requiring prisoners incarcerated in Federal correctional institutions to pay some or all of the costs incident to the prisoner's confinement." Pub.L. No. 100–690, § 7301, 100th Cong, 2d Sess., 102 Stat. 4463 (November 18, 1988) (codified at 18 U.S.C.A. § 4007 (West, 1992 Supp.)) (emphasis added). The wording of that section strongly suggests that Congress did not believe that other provisions of the Sentencing Reform Act already authorized fines to pay for the cost of imprisonment.

Apparently recognizing the absence of statutory authority for recouping the costs of imprisonment, the government posits that, since the monies collected from the section 5E1.2(i) fines go to victim compensation via the Crime Victims Fund, the "purpose" of section 5E1.2(i) is victim compensation and restitution rather than payment of the costs of imprisonment. The government argues that the guideline is consistent with the Act if the Act authorizes courts to consider victim compensation in sentencing defendants.

■ We have no doubt that the assessment of a fine to pay for victim compensation and victim restitution would be authorized by the Act. The language of the statute itself makes plain the congressional desire to have victim compensation be a part of sentencing. Section 3572(a)(3) provides that a judge, in imposing a fine, may consider "any pecuniary loss inflicted upon others as a result of the offense." In authorizing district courts to consider the amount of harm a defendant inflicts on a victim in section (a)(3), the Act necessarily

encompasses the ability of district courts to assess a fine in part to fund such compensation. Thus, fines for victim compensation are justified as a means of effectuating the statutory goal of restitution.[10]

Merely finding that restitution and victim compensation are legitimate purposes of the Act does not, however, compel the conclusion that fines assessed under section 5E1.2(i) are authorized by the Act. Spiropoulos notes that the guideline itself does not mention payment to the Crime Victims Fund and does not, on its face, appear to have anything to do with the payment of restitution to crime victims. He therefore argues that, whatever the ultimate use of the money assessed under section 5E1.2(i), the Act does not authorize the *calculation* of a fine on the basis of the costs of imprisonment, a factor not addressed by Congress in its definition of sentencing policy.

■ As we read the guideline, we believe that it contemplates the payment of the fine for the purpose of compensating the government for the costs of imprisonment and not for victim restitution. The guideline states that a defendant shall pay a fine that is "at least sufficient to *pay the costs to the government* of any imprisonment ..." On its very face, the guideline states that the costs will be paid to the government in an amount based on the costs of imprisonment. It stretches credulity to assume that the "purpose" of this fine is other than to compensate the government, either directly or indirectly, for the costs it incurs for incarcerating a defendant.

We recognize that the Commission itself lacks the authority to direct how fines assessed under the Guidelines be spent. That power belongs to Congress alone. See *Hart v. United States*, 118 U.S. 62, 65–66, 6 S.Ct. 961, 963, 30 L.Ed. 96 (1886) (Congress alone controls funds in the Treasury). The resulting anomaly is that, as a result of the Victim Compensation and As-

---

**10.** We note also that section 3572(a)(4) requires a court to consider "whether restitution is ordered or made and the amount of such restitution." This provision specifically empowers the district courts to order restitution, and although payment to the Crime Victims Fund is not a means of direct restitution, it is a means of achieving indirect or "social" restitution.

sistance Act, the money actually goes to the Crime Victims Fund, although the guideline, as promulgated, plainly contemplates that the monies assessed be used for the cost of incarceration. Certainly any sentencing judge who was not focused on the fine print in the background note of the original section (which is not in the current Guidelines), see note 8, would so believe.

In short, we do not think that the ultimate manner in which the money is spent should control our analysis of the guideline, as the guideline is plain on its face in designating what its purpose is. Rather, we conclude that the purpose of the guideline is to assess a fine to pay for the costs of imprisonment and that such purpose is inconsistent with the Sentencing Reform Act, rendering section 5E1.2(i) invalid.

The government contends, however, that because the fine monies are paid into the Crime Victims Fund, the fine is justified as a rough means of calculating an appropriate restitutionary amount and is therefore justified as consistent with the Act's restitutionary purposes. We avoid construing the guideline as the government suggests because, as Spiropoulos notes, there is serious doubt as to whether the guideline, when so construed, satisfies the requirements of due process. We agree with Spiropoulos that if the guideline is a method for assessing restitution, it runs the risk of being irrational. See *United States v. Santos*, 932 F.2d 244, 255 (3d Cir.1991) (standard for determining whether a law comports with the Due Process Clause is whether it has a rational basis).

The government urges that it satisfies the rationality requirement because the length of imprisonment is a rough measure of the seriousness of a defendant's crime, which, in turn, measures the amount that victims have suffered and provides a reasonably reliable gauge for the amount of restitution that a defendant should pay into the Crime Victims Fund. The government contends that, because the amount of the fine is increased based on the length of a

defendant's imprisonment, the Crime Victims Fund gains more restitution from those who have inflicted more harm upon their victims.

We acknowledge that there is generally a correlation between the amount of time a defendant is incarcerated and the seriousness of his or her crime. Additionally, the amount of restitution a defendant owes his or her victims is generally related to the seriousness of that defendant's crime. The variable in the equation calculating a section 5E1.2(i) fine, that is, the *length* of imprisonment, is, therefore, at least minimally related to the goal of calculating accurate restitution.

We would have doubts as to whether the guideline is rational, however, because the *cost* of a defendant's incarceration bears no apparent relationship to the amount that a particular defendant's victim has been injured. That amount, which is calculated using a constant figure for all defendants, bears no apparent relationship to the amount of harm that a defendant has inflicted on his or her victims. Rather, it is an arbitrary constant, and one which is a major factor in calculating the resultant amount. Under the government's view of the guideline, the Commission could select any arbitrary constant and use it as a basis for calculating restitution provided the constant was multiplied by a variable factor proportional to the seriousness of the defendant's crime. Although we do not decide the issue, we have grave doubts about the rationality of such a system and because of these doubts, we avoid interpreting the guideline as a method of calculating restitution.[11]

We recognize that our analysis in this regard is in tension with the reasoning of *United States v. Hagmann*, 950 F.2d 175 (5th Cir.1991). There, the court confronted a due process challenge to section 5E1.2(i) similar to the one that Spiropoulos presents here. It held that there was a sufficient relationship between the cost of imprisonment and the harm a defendant causes to

---

**11.** As the text suggests, we need not and do not decide but only assume that the Act would authorize a guideline to serve the purpose of vic-

tim restitution and victim compensation calculated on the rough basis of costs of imprisonment.

society to satisfy the rationality requirement of the Due Process Clause:

> Once convicted, criminals impose a dual financial cost upon society—both the price of their imprisonment and the expense of trying to alleviate some of the personal cost inflicted upon their victims. Criminals' terms of imprisonment generally reflect, among other things, the seriousness of their crimes and the harm that they have inflicted upon their victims. We find, therefore, that the uniform practice of fining criminals on the basis of their individualistic terms of imprisonment—an indicator of the actual harm each has inflicted upon society—is a rational means to assist the victims of crime collectively.

Id at 187.

With all respect, we believe that this presents too facile an analysis of the Sentencing Reform Act and the Guidelines. The *Hagmann* court erred primarily by failing to recognize that where the purported statutory justification for imposition of section 5E1.2(i) fines is restitution, restitution to victims must be the particular governmental purpose that the guideline serves.[12] We therefore conclude that to the extent that *Hagmann* relies on the "the price of [defendants'] imprisonment," *Hagmann*, 950 F.2d at 187, it is incorrect because, as the government concedes in this case, recouping "the price of imprison-

ment" is not a purpose of the Act. Although sparing the taxpayers the cost of imprisonment would likely be a constitutionally permissible governmental purpose, and, indeed, might be a laudable policy, it is not one expressed in 18 U.S.C.A. § 3553 or 18 U.S.C.A. § 3572, and we therefore find it irrelevant in evaluating the constitutionality of the guideline.

To the extent that *Hagmann* suggests that the guideline is a rational means of calculating restitution, we disagree for the reasons we have already stated, see page 167.[13] The cost of imprisoning a defendant has little, if anything, to do with the amount that that defendant has harmed his or her victim(s), and is therefore questionable as an appropriate method of restitution.

It is a well-established principle that we are required to construe laws, if possible, as constitutional, see *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979). Recognizing that a constitutional defect might arise if we viewed the guideline as a mechanism for calculating restitution, we do not construe the guideline as aimed at that end. Rather, we presume that the purpose of the guideline is the constitutionally permissible goal of allowing the government to recoup the costs of imprisonment. That goal, however, is not autho-

**12.** We do not read the Act as providing for general societal restitution in sentencing. 18 U.S.C.A. § 3553(a)(7) refers only to "restitution to any victims of the offense." 18 U.S.C.A. § 3572(a)(3) refers to "any pecuniary loss inflicted upon others as a result of the offense." That language suggests that restitution should be made for a defendant's crime and not for the costs of his or her imprisonment after the crime has been completed.

**13.** Our holding may also conflict with that of the Tenth Circuit in *United States v. Doyan*, 909 F.2d 412 (10th Cir.1990), although the argument raised there derived from a different doctrinal source. In *Doyan*, the court confronted the question whether section 5E1.2(i) violates the equal protection clause by forcing the costs of imprisonment to be paid only by those who have been convicted of a crime. Although the doctrinal argument was different, the court ultimately was required to decide the same issue: "whether requiring such reimbursement from a

convicted felon for the costs of his incarceration bears some rational relationship to a legitimate state purpose." Id at 416. The court concluded that the fine did bear a rational relationship to a governmental purpose: "Whether the purpose of the contested fine is to punish, deter, or spare the taxpayers a substantial expense that has been generated by an intentional criminal act, we cannot say that Guideline § 5E1.2(i) as applied here bears no rational relation to the legitimate governmental interests in criminal justice." Id.

As we have said with regard to *Hagmann,* we do not believe that the guideline advances the restitutionary goals of the Act, and we do not believe that the fine can be justified as advancing the punitive or deterrent purposes of the Act. Numerous other provisions of the Guidelines are directed towards those ends, but the government has presented no evidence or logic that would support the inference that section 5E1.2(i) rationally serves those ends.

rized by the Act, and we therefore hold that the fine imposed upon Spiropoulos was invalid. We thus will vacate and remand to the district court for vacatur of the fine against Spiropoulos insofar as it orders him to pay the costs of imprisonment.

## V. CONCLUSION

We conclude by noting that, as a matter of policy, requiring defendants to pay the costs of their imprisonment seems to be a sound idea. Defendants impose high costs on society not only through the damage of their crimes but also through the financial costs of incarcerating them as a result of those crimes. Indeed, Congress may well authorize such a penalty in the near future. In addition to the current Act, which authorizes studying the question, see page 24, the executive branch has proposed requiring that prisoners be required to pay a fee to cover the costs of their imprisonment. See *Budget of the United States Government,* Fiscal Year 1993, Section 23, User Fees and Other Collections, at Part Two—16–17 and Table 23–2. Nevertheless, our review of the Sentencing Reform Act convinces us that Congress has not, as of yet, authorized such a penalty. The Commission, in promulgating a guideline designed to effectuate that end at this juncture, has therefore overstepped its bounds.

We also emphasize that restitution is a valid goal of the Act that the Commission is free to effectuate that goal through the Guidelines. The Guidelines already provide a mechanism for doing so through the restitutionary orders provided for in section 5E1.1. But because the guideline in issue here would likely not constitutionally advance that interest, we cannot uphold it on that basis.

For the foregoing reasons, the judgment of the district court will be reversed and the case remanded for vacatur of the fine against Spiropoulos insofar as it requires him to pay the cost of imprisonment. In all

* The Amicus Curiae brief is allowed to be filed.

other respects, the judgment will be affirmed.