**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Dale TURNER, Defendant–Appellant.**

**No. 93–1148.**

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1993.

Decided July 14, 1993.

Madeleine S. Murphy, Asst. State's Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

William T. Huyck, Chicago, IL (argued), for Dale Turner.

Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Sentencing Guidelines prescribe fines for most federal offenses. Each offense level corresponds to a range of fines. U.S.S.G. § 5E1.2(c). In addition to the fine derived from the table, "the court shall impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered." U.S.S.G. § 5E1.2(i). Dale Turner contends that this additional fine is unauthorized by statute and in any event may not be imposed if the judge determines that the defendant is unable to pay the base fine.

Turner tried to bilk the Internal Revenue Service by filing an electronic tax return claiming a refund. Turner's claim that taxes had been withheld from his wages was

false. The IRS caught on and did not pay. The sum involved, less than $3,000, produced an offense level that does not require imprisonment but calls for a fine in the range of $100 to $5,000. The district judge sentenced Turner to spend 90 days in a work release program. Concerning fines, the judge stated:

> There is no fine, nor is restitution applicable to this case—I'm not ordering a fine because I don't believe the defendant could pay. Restitution is not applicable.

> The defendant does have some capacity to earn income; consequently, I do not excuse the cost of community confinement.... It's about 900 a month, I think. It will be an obligation he has consistent with his financial wherewithal. He may very well have to pay it on an installment plan.

Turner's lawyer promptly filed a motion asking the district judge to rescind the obligation to pay the $2,700 cost of the work release program. The judge issued an order reading, in full: "Motion taken under advisement." The judgment of conviction was docketed on January 14, 1993. Under Fed. R.Crim.P. 35(c), the district court had seven days to correct any errors in the judgment. After this time had passed without a decision on the motion, Turner filed a notice of appeal. Our jurisdiction is secure. The district court's inaction had the same effect as denying the motion, making the judgment final on the date the district judge's power to alter the sentence expired.

■ Three courts of appeals have addressed the question whether § 5E1.2(i) is valid. Two have held that it is, *United States v. Hagmann*, 950 F.2d 175, 186–87 (5th Cir.1991); *United States v. Doyan*, 909 F.2d 412 (10th Cir.1990), and one that it is not, *United States v. Spiropoulos*, 976 F.2d 155, 164–69 (3d Cir.1992). The third circuit concluded that the Sentencing Commission exceeded its authority in promulgating § 5E1.2(i) because measuring a fine by the costs of confinement does not reflect any of the statutory objectives of sentencing. Yet Congress told the Commission to consider not only "the nature and degree of the harm caused by the offense" but also "the deter-

rent effect a particular sentence may have on the commission of the offense by others". 28 U.S.C. § 994(c)(3), (6). These instructions track the criteria addressed to judges in 18 U.S.C. § 3553(a)(2)(A), (B), calling on the bench to impose sentences that "reflect the seriousness of the offense" and "afford adequate deterrence to criminal conduct". The Guidelines call for longer sentences as the harm caused by the offense rises; longer sentences (or sentences in more secure custody) are more costly; thus the costs of confinement rise with the seriousness of the crime, and a fine based on these costs therefore reflects the seriousness of the offense. Moreover, higher fines are more potent deterrents to crime. Section 5E1.2(i) increases the fine, and therefore increases deterrence. Nothing more is necessary to show that the Commission acted within its statutory authority. And despite the third circuit's qualms, 976 F.2d at 167, the rationality of the approach cannot be doubted. The costs of incarceration do not precisely reflect social loss and deterrence, to be sure, but the Constitution does not require a close match between the gravity of the offense and the penalty meted out. *Chapman v. United States*, —— U.S. ——, ——, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524 (1991).

According to the third circuit, "there is no reason to believe that assessing the costs of imprisonment (in addition to other fines) deters criminal conduct". *Spiropoulos*, 976 F.2d at 165. This is equivalent to asserting that higher fines do not increase deterrence, a proposition that leaves us flabbergasted. The system of penalties under the Guidelines is constructed on the belief that higher fines, and longer sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition. Daryl A. Hellman & Neil O. Alper, *Economics of Crime: Theory and Practice* (2d ed. 1990); David J. Pyle, *The Economics of Crime and Law Enforcement* (1983); William N. Trumbull, *Estimations of the Economic Model of Crime Using Aggregate and Individual Level Data*, 56 S.Econ.J. 423 (1989). Guideline 5E1.2(i) increases the fines imposed on defendants, and therefore increases deterrence. A carefully thought out theory of criminal penalties proposed by Professor Gary Beck-

er—a theory that was cited when Becker received the 1992 Nobel Prize in Economics—includes the costs of incarceration (and the other costs of the criminal justice system) as part of the socially optimal punishment for crime. See Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J.Pol.Econ. 169 (1968). For recent elaborations see, e.g., Lucian Arye Bebchuk & Louis Kaplow, *Optimal Sanctions When Individuals Are Imperfectly Informed about the Probability of Apprehension*, 21 J.Leg.Stud. 365 (1992); Michael K. Block, *Optimal Penalties, Criminal Law and the Control of Corporate Behavior*, 71 B.U.L.Rev. 395 (1991); John R. Lott, Jr., *An Attempt at Measuring the Total Monetary Penalty from Drug Convictions*, 21 J.Leg.Stud. 159 (1992); A. Mitchell Polinsky & Steven Shavell, *Enforcement Costs and the Optimal Magnitude and Probability of Fines*, 35 J.L. & Econ. 133 (1992). (Professor Block was a member of the Sentencing Commission when § 5E1.2(i) was adopted, and Professor Lott was the Commission's Chief Economist.) Nothing in § 3553 or § 994 rejects an approach to deterrence that includes the costs of custody among the considerations that influence the selection of a fine.

Two other considerations troubled the third circuit. First, that court observed that Congress has instructed the Commission to "study the feasibility of requiring prisoners incarcerated in Federal correctional institutions to pay some or all of the costs incident to the prisoner's confinement." Section 7301 of Pub.L. 100–690, 102 Stat. 4463 (1988). Such a command implies, the court believes, that "study" is the *only* permissible activity for the Commission. 976 F.2d at 166. Why? The statute does not create such a restriction. Section 5E1.2(i) was part of the Guidelines on their promulgation in 1987, before the enactment of § 7301. Section 7301 does not mention or subtract from any of the Commission's permanent legislation, and we all know the canon that repeals by implication are disfavored. The authors of § 7301 likely were unaware of § 5E1.2(i). At all events, what better way to study something than to try it out and see what happens?

Second, the third circuit was disturbed by the disparity between the text of § 5E1.2(i), which calls for a fine "at least sufficient to pay the costs to the government" of custody or supervised release, and the actual disposition of the money collected from the defendant, which per 42 U.S.C. § 10601 goes into a fund from which victims of crime are compensated. How can § 5E1.2(i) serve its purpose, the court wondered, if victims rather than the Bureau of Prisons receive the money? *Spiropoulos*, 976 F.2d at 166–67. Once we understand the function of § 5E1.2(i) as deterrence, however, this concern loses force. Deterrence does not depend on what the government does with the money; it is enough that the offender be deprived of the wealth. From a defendant's perspective, the effect is the same if the money goes to victims, the Bureau of Prisons, or an incinerator. From the public's perspective, too, the disposition of the fines is irrelevant. Let us suppose that funds collected under § 5E1.2(i) come to $10 million annually. The United States can: (a) use the $10 million to pay victims and appropriate $10 million for the Bureau of Prisons; (b) use the $10 million to cover the costs of the prisons and appropriate $10 million to pay victims; or (c) shred the currency and print $20 million in fresh bills, allocating at will between victims and prisons. The three possibilities are equivalent. Just as the "highway trust fund" into which gasoline taxes are deposited is an artifact of accounting, so the disposition of fines is irrelevant. There is no correspondence between sources and uses of funds.

■ Anticipating that we might find *Spiropoulos* unpersuasive, Turner contends that he is entitled to prevail under the language of § 5E1.2(i) itself. That section instructs the court to "impose an additional fine" adequate to cover the costs of imprisonment. When the court declines to impose any fine under § 5E1.2(c), how can it impose an "additional" fine under § 5E1.2(i)?, Turner asks. Three courts of appeals have concluded that the "plain language" of § 5E1.2(i) forbids a fine measured by the costs of custody when the court declines to impose a fine based on the table in § 5E1.2(c). *United States v. Fair*, 979 F.2d 1037, 1042 (5th Cir.1992); *United States v. Corral*, 964 F.2d 83 (1st

**538**

Cir.1992); *United States v. Labat*, 915 F.2d 603, 607 (10th Cir.1990). An "additional" fine doubtless means that the judge must add two numbers together, but zero is a number. There is no semantic inconsistency in treating § 5E1.2(i) as a command to add the costs of incarceration to whatever fine the court imposes under § 5E1.2(c), including a fine of zero. Courts ought not read the Guidelines in a way that makes the Sentencing Commission look foolish—yet it would be folly to create a rule under which imposing a fine of $1 from the table *compels* the court to add a fine measured by the costs of incarceration, while imposing a fine of $0 from the table *forbids* the court to add a fine measured by the costs of incarceration. Such an all-or-nothing approach would exclude all intermediate fines, for no apparent reason. Suppose the cost of confining a defendant is $10,000, and the court believes that this person can pay $5,000. If the court imposes the $5,000 fine under § 5E1.2(c) it must add another $10,000, while if it excuses the collection of the $5,000, in order to get the total closer to the defendant's resources, it cannot demand that the defendant pay a single penny.

 Far better, we think, to read § 5E1.2 in the following way. First, the court must fix an appropriate fine using the table in § 5E1.2(c) that is keyed to the offense level and the criteria in § 5E1.2(d). Second, the court must determine an "additional fine amount" that is at least sufficient to pay the costs to the government" of custody or supervision. U.S.S.G. § 5E1.2(i). Third, the court must inquire whether the defendant can pay the sum of the amounts determined under § 5E1.2(c) and (i). If the defendant cannot pay at once, the court must decide whether he can pay all or part of the fine in installments. U.S.S.G. § 5E1.2(f). The court should require the defendant to pay as much as he is able. If the court concludes that the defendant cannot pay anything, even with the benefit of installments, it may decline to impose any fine. U.S.S.G. § 5E1.2(a), (f). Putting the computation of the entire fine, including any amount under § 5E1.2(i), ahead of the decision about the defendant's ability to pay makes sense of the "additional fine amount" language in § 5E1.2(i) while assuring a full measure of

discretion to match the fine to the defendant's resources.

One implication of this reading is that if the judge believes that the defendant lacks the ability to pay a fine computed from the table in § 5E1.2(c)—to pay *any* fine, even in installments—then no "additional" fine may be imposed under § 5E1.2(i). We agree to this extent with *Fair, Corral,* and *Labat.* A person who cannot be expected to pay $100 reckoned under § 5E1.2(c) cannot be expected to pay $100 reckoned under § 5E1.2(i).

 The district judge stated that Turner could not pay any fine imposed under § 5E1.2(c). Yet the judge immediately added: "The defendant does have some capacity to earn income; consequently, I do not excuse the cost of community confinement." This suggests that the judge may have been asking whether Turner could pay $100 or more immediately, rather than whether he could pay the § 5E1.2(c) fine in installments. If, as the judge stated, Turner can pay $2,700 in installments, then he can pay a fine calculated under § 5E1.2(c). And if Turner cannot pay such a fine, then he cannot be expected to pay anything computed under § 5E1.2(i).

The tension between the judge's treatment of the § 5E1.2(c) fine and the § 5E1.2(i) fine makes it prudent to return this case for further proceedings. On remand the district judge shall establish a new fine using the approach to § 5E1.2 that we have described. Because the United States has not filed a cross-appeal, the total fine imposed on remand may not exceed $2,700 in present value.

VACATED AND REMANDED.