**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Luis SANCHEZ–ESTRADA and Federico Vargas, Defendants–Appellants.**

**Nos. 94–2570, 94–2594 and 94–2906.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1995.

Decided Aug. 11, 1995.

14. A–B has not advanced similar arguments in this appeal.

Barry Rand Elden, Asst. U.S. Atty., Jacqueline Ross (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

John M. Beal (argued), Chicago, IL, for Luis Sanchez–Estrada.

Joseph R. Lopez, John M. Beal (argued), Chicago, IL, for Federico Vargas.

Before ESCHBACH, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Saul Avitia, Gabino Montalvo–Herredia, Luis Sanchez–Estrada (Sanchez), and Federico Vargas–Rios (Vargas) were all indicted and charged with conspiracy to possess cocaine with the intent to distribute in violation of 21 U.S.C. § 846 and one count of knowingly possessing cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Sanchez was also indicted and charged with carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). Sanchez pled guilty to the conspiracy to possess cocaine with intent to distribute and carrying a firearm in relation to a drug trafficking offense charges, and Vargas pled guilty to the conspiracy to possess with

intent to distribute cocaine count.[1] Sanchez was sentenced to fifteen years imprisonment, five years supervised release, fined $4000 to be paid in monthly installments out of his prison earnings to the extent that his earnings exceed $50 in that month, and ordered to pay a special assessment of $100. Vargas was sentenced to ten years imprisonment, five years supervised release, fined $4000, and ordered to pay a $50 special assessment. Vargas's fine was to be paid in monthly installments deducted from his prison earnings, to the extent that his earnings exceed $40 in any given month. Vargas requested, and was denied, a two-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1. Vargas appeals this denial and Sanchez joins Vargas in appealing the district court's decision to garnish their prison wages to satisfy their fine obligations.

We AFFIRM.

## I. BACKGROUND

On July 20, 1993, Gabino Montalvo, one of Sanchez's and Vargas's co-conspirators, spoke on the telephone with an undercover agent from the Northeast Metropolitan Enforcement Group (NEMEG), in Chicago, Illinois. During the conversation, the officer posed as a drug dealer who was interested in purchasing a substantial amount of cocaine for a customer. Montalvo agreed to sell the agent the cocaine [2] and thereafter telephoned his drug source, Vargas. The defendant Vargas informed Montalvo that the price of one kilo would be $24,000 and that he would not only supply the cocaine, but would also act as the intermediary in the transaction, between the suppliers, Saul Avitia and Sanchez, and Montalvo and the agent. Montalvo relayed the price of the cocaine to the agent, and they agreed upon a date, time, and place for the sale.

As arranged, Vargas, Sanchez, and Avitia met at a restaurant in Chicago, Illinois, on July 22, 1993, to consummate the sale of the ten kilos of cocaine. Montalvo and several undercover officers arrived at the restaurant, and shortly after 6:00 p.m. the agents showed Avitia $120,000, one half of the agreed upon purchase price. The agents told Avitia that the other half of the money was in a hidden compartment of the car and would be paid after the agents received delivery of five kilos of cocaine. Vargas wanted the $120,000 before he delivered the cocaine to the officers, but agreed to give the officers half of the cocaine up front in exchange for the full purchase price, $240,000.

At this time, Avitia and Sanchez left the restaurant to retrieve the cocaine while Montalvo introduced Vargas to the undercover agents. Vargas told the officers that Sanchez and Avitia were nervous about the transaction because fifteen kilos of cocaine had recently been stolen from them, but Vargas assured the officers that once this initial transaction was consummated, they would have no problems with any future transactions.

At 8:20 p.m., Sanchez and Avitia returned and parked approximately one block from the restaurant. Montalvo and Vargas walked over to Sanchez's and Avitia's vehicle, spoke with them, returned to the officer's location, and informed them that one of them should walk over to Sanchez and Avitia and inspect the cocaine. Avitia displayed a kilo of cocaine, located in the rear passenger compartment of the vehicle, to one of the officers and informed him that the other nine kilograms of cocaine were stored elsewhere in the car. At this time, Sanchez and Avitia drove to another corner, Sanchez left the vehicle, and informed one of the officers and Montalvo that the cocaine was in the car.

After the officer located the cocaine in the vehicle, he arrested Vargas, Sanchez, Avitia, and Montalvo. A subsequent search of the vehicle uncovered about ten kilograms of

---

1. The other two defendants are not subjects in this appeal. Avitia chose to go to trial and Montalvo pled guilty to one count of conspiracy to possess with intent to distribute cocaine. The record fails to reflect the disposition of either case.

2. This was not the agent's first contact with Montalvo. In November of 1992, Montalvo had agreed to sell the same agent 100 kilos of cocaine for two million dollars. Montalvo's alleged source for this cocaine was Vargas. Because the agent was unable to establish contact with Vargas, this 1992 deal fell through.

89% pure cocaine and a pat down of Sanchez's person revealed that he was carrying a loaded .38 Colt Trooper Model six-shot caliber revolver. He denied ownership of the weapon and stated that he had discovered it in Avitia's car and put it in his waistband without much thought.

Pursuant to written plea agreements between the government and defendants Vargas and Sanchez, the former pled guilty to count one, and the latter pled guilty to counts one and three.[3] At their plea hearings, the defendants acknowledged that their attorneys received copies of the plea agreements prior to the plea hearing, and that their counsel, in turn, thoroughly discussed the contents of these agreements with the defendants and explained the consequences of the pleas to them before they pled guilty. Additionally, both plea agreements were signed by the defendants, defense counsel, and the United States Attorney.

The probation department calculated Sanchez's adjusted offense level as 29[4] and found that he had a criminal history category of I.[5] The district court sentenced Sanchez to a term of ten years imprisonment as to count one, conspiracy to distribute cocaine, and five years imprisonment as to count three,[6] carrying a firearm in relation to a drug trafficking offense, to be served consecutively, five years supervised release, and a total special assessment of $100. The district court also imposed a $4,000 fine and ordered that the fine be satisfied with monthly installment payments to be deducted from Sanchez's prison earnings, provided his earnings exceeded $50 in that month.[7] The defendant was further directed to pay the unsatisfied balance remaining at the time of his release from confinement during his term of supervised release in equal monthly installments.

Vargas's base and adjusted offense level was 32 and he had a criminal history category of I.[8] On July 25, 1994, Vargas was sentenced to a term of ten years imprisonment (mandatory minimum), a $4,000 fine, a five year period of supervised release and a special assessment of $50. The sentence imposed deviated from the sentence recommended in the plea agreement· in that the prosecution agreed to recommend that Vargas receive a two-level reduction in his base offense level pursuant to U.S.S.G. § 3E1.1, yet at the time of sentencing, the prosecution withdrew its prior approval of the reduction and made no recommendation for such a reduction at the sentencing hearing because the Assistant United States Attorney agreed with the probation officer that Vargas did not acknowledge remorse for his involvement in the drug conspiracy and that he failed to demonstrate truthfulness to the government because he was less than truthful with the same investigating probation officer concerning his criminal history and prior drug use.

The plea agreement explicitly conditioned the reduction on Vargas's continued cooperation and truthfulness:

3. The record is not clear whether the other counts against the defendants were dismissed, and the plea agreements do not set forth what happened to these charges. The record also makes no mention of whether the district court considered the charges as relevant conduct during the sentencing hearing. We have been unable to discover specific reference to the same, nor has it been called to our attention.

4. Sanchez's base offense level was 32 but he received a two level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), and a one level reduction because his offense level was greater than 16 and he provided complete information to the government about his involvement in the offense. U.S.S.G. § 3E1.1(b).

5. Because Sanchez had no prior criminal record, his criminal history category was I.

6. Each of the sentences imposed on the defendant Sanchez was the mandatory minimum for the offenses involved.

7. The probation officer concluded from the interview with the defendant that he was unable to pay a fine in a lump sum because Sanchez had neither assets nor any cash flow. In light of the fact that he would be required to work during his term of custody with the Bureau of Prisons, the officer suggested that Sanchez be ordered to pay his fine on an installment basis during his incarceration.

8. Vargas was arrested for Criminal Damage to Property in 1987, Possession of Cannabis in 1988, and Domestic Battery in 1991. Each charge was *nolle prossed.*

Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guideline 3E1.1, a two-level reduction in the offense level is appropriate.

The plea agreement further acknowledged that:

The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probations officer's or the Court's concurrence with the above calculations.

Finally, the signed agreement provided that: Errors in calculations or interpretation of any of the guidelines may be corrected or amended by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation officer and/or court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections or amendments, and the defendant shall not have a right to withdraw his plea on the basis of such correction or amendments.

The probation officer who conducted the presentence investigation and authored the presentence report noted that Vargas neither acknowledged his past alcohol nor his drug use, that he lied about his prior criminal history to the extent that he failed to reveal that he had been arrested on three occasions, and he further failed to express remorse for

his involvement in the drug conspiracy. Based on this information, the prosecution did not recommend that Vargas be given the two-level reduction and the district judge concurred and denied the reduction, referring to the presentence report, stating that Vargas failed to express any remorse for his conduct and also because he was of the opinion that Vargas was less than truthful with the probation officer regarding his criminal history and prior alcohol and drug use.

Unlike Sanchez, the district court held that Vargas had the ability to pay at least a portion of his fine immediately. Vargas had a 50% ownership in $5,500 unencumbered assets, his wife received approximately $400 per month in salary, and approximately $200 a month from the Illinois Department of Public Aid,[9] and their family had a positive cash flow each month. The district court ordered that Vargas pay whatever portion of the fine he was presently able to pay, with the unpaid balance to be paid in monthly installments from his prison wages, in any month that his wages exceeded $40 in that month. The outstanding balance remaining on his release from prison is to be paid during his term of supervised release in equal monthly installments.

Vargas and Sanchez both appeal the conditions imposed on the fines levied. Vargas appeals the denial of the two-level reduction for acceptance of responsibility.

## II. ISSUES

(1) Vargas argues that the district court abused its discretion in denying him a two-level reduction for acceptance of responsibility. (2) Vargas joins Sanchez in contesting the district court's authority to impose fines to be paid from their prison earnings.

## III. DISCUSSION

### A. ACCEPTANCE OF RESPONSIBILITY

■■■ Vargas argues that because he entered a plea of guilty,[10] and agreed to the

---

9. The record does not reflect why the Vargas–Rios family received Public Aid.

10. The record is unclear as to when Vargas's case was scheduled to go to trial. It had origi-

facts stipulated in his plea agreement, he was entitled to a two-level reduction for acceptance of responsibility.[11] The probation officer recommended that Vargas be denied the reduction because:

> Mr. Vargas–Rios did not acknowledge any personal substance abuse or excessive alcohol use. He also denied he has participated in any substance abuse treatment programs. A review of the Northern District of Illinois United States Pretrial Services information, furnished by Mr. Vargas–Rios, revealed he acknowledged the use of marijuana and cocaine on a monthly basis. When the undersigned officer confronted Mr. Vargas–Rios about the inconsistency, he maintained he has not used drugs.

The district court accepted the probation officer's recommendation and denied Vargas' request for the two-level reduction finding that:

> [t]he probation officer has noted numerous instances where you have lied or failed to disclose information, which is the same as lying. The probation officer is the agent of the court, and therefore you have lied to the court. While your lying was not apparently obstructive of the investigation of your offenses sufficient to warrant enhancements, it establishes beyond any doubt that at the time it was critical, you demonstrated a failure to accept responsibility, which denies you a two-level reduction for acceptance of responsibility.

 "A defendant has the burden of proving acceptance of responsibility, and . . .

the trial judge is in a superior position to decide whether acceptance is sincere, and we pay great deference to that decision." *United States v. Kerr,* 13 F.3d 203, 205 (7th Cir.1993), *cert. denied,* ——— U.S. ———, 114 S.Ct. 1629, 128 L.Ed.2d 353 (1994) (citing *United States v. Tolson,* 988 F.2d 1494, 1497 (7th Cir.1993)). The district judge

> has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record.*

*Tolson,* 988 F.2d at 1497 (emphasis in original, quotation omitted). Thus, the refusal to grant a two-level sentence reduction for acceptance of responsibility is reviewed by this court for abuse of discretion, "which is to say that we ask whether the decision was within a zone of reasonable responses to the facts." *Gomez,* 24 F.3d at 926. A defendant's failure to demonstrate truthfulness to a probation officer is "certainly a factor upon which a judge might properly rely in determining that the defendant has failed to accept responsibility." *Kerr,* 13 F.3d at 205 (citation omitted).

We begin by noting that Vargas's plea agreement clearly and specifically stated that the prosecution would recommend a two-level reduction for acceptance of responsibility only if the defendant continued to affirmatively accept responsibility for his crime and

---

nally been scheduled for January 19, 1994, but his trial counsel requested an adjournment and the trial judge granted it. Thereafter, on March 24, 1994, Vargas entered into a plea agreement.

**11.** Pursuant to our holding in *United States v. Gomez,* 24 F.3d 924, 926 (7th Cir.) *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 280, 281, 130 L.Ed.2d 196, 198 (1994), Vargas' attorney has submitted this matter by *Anders* brief. In *Anders v. California,* 386 U.S. 738, 744, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967), the Supreme Court held that when an attorney concludes that his or her client's appealable issues to be entirely frivolous, he or she should advise the court of this position and request that he or she be allowed to withdraw. In doing so, he or she must file a brief detailing anything in the record that might

support an argument on appeal. If the court finds that the appeal is frivolous, it may grant the attorney's request to withdraw from the case.

> In *Gomez,* we made our position clear that if a client insists upon appealing the district court's decision to deny the two-level reduction for acceptance of responsibility when the appeal of that decision, in the attorney's opinion, is without merit, in the opinion of that attorney, the attorney can fulfill his or her obligations to the client and this court with the filing of an *Anders* brief. *See also United States v. Goad,* 44 F.3d 580, 589, n. 17 (7th Cir.1995) (citing *Gomez,* 24 F.3d at 926) ("An attorney has an ethical duty to refrain from making frivolous arguments to the court. An attorney may fulfill that obligation by filing an *Anders* no merit brief").

if the government did not "receive additional evidence in conflict with" its decision to recommend the reduction. Furthermore, Vargas and his attorney both signed the agreement which stated "Defendant acknowledges that he had read this Agreement and carefully reviewed each provision with his attorney." The agreement also provided that the sentencing judge was not bound by the preliminary calculations and recommendations of the prosecution, but rather would impose a sentence based on the information in the presentence report from the probation officer. Vargas clearly was aware that he would not automatically be granted the two-level reduction just because he entered into the plea agreement and that he would have to fully and honestly cooperate with the probation officer who was preparing his presentence report.

Additionally, the manner in which Vargas's plea was taken was thorough and the consequences of his plea were completely explained to him. In fact, at Vargas's sentencing hearing, his attorney acknowledged the thoroughness of the plea agreement and hearing:

> If you recall, your Honor, the plea agreement in this case was well drafted by the United States Attorney. We had a lengthy plea hearing that day with the defendant under oath. You asked the defendant questions regarding the allegations in the plea agreement. You asked the defendant if he in fact was guilty; he responded yes. You asked the defendant if the version of the events that were contained in the plea agreement, if those were the events which actually transpired; under oath, he said yes, they were.

When Vargas pled guilty to conspiring to possess cocaine with intent to distribute, the district judge made sure that he was competent to plead guilty, that he read and understood the entire plea agreement and the indictment against him, and that he was satisfied that his attorney fully explained the consequences of the plea agreement to him. The judge further informed Vargas that if he went to trial, he would have the absolute right to plead not guilty, to confront and cross-examine the witnesses against him, to subpoena witnesses in his own behalf and Vargas was also told that if he went to trial, he would be presumed innocent, would have to be proven guilty beyond a reasonable doubt, would have the right not to testify, and that he could have twelve jurors of his peers determine his guilt or innocence. Vargas stated that he understood that if he pled guilty he would waive each of these rights.

More importantly, the district judge also informed Vargas that "the court can reject the plea agreement, after completion of the presentence investigation, if the court finds that the plea agreement is not in the interest of justice[.] ... [T]he final decision as to what your sentence will be rests with the court[.]" Vargas stated that he understood that the court had the power to determine his sentence and that it was not bound by the plea agreement.

At the sentencing hearing, Vargas's attorney stated that "[a]pparently, ... the only reason [the acceptance of responsibility reduction] wasn't given was because [Vargas] didn't prepare a written version of events." Vargas was not denied the two-level reduction because he failed to write his own version of the events of his crime. Rather, the probation officer stated that Vargas "did not acknowledge ... his willful involvement in the instant offense, nor did he express regret for his conduct." Additionally, Vargas was arrested three times as an adult,[12] yet he failed to reveal any of the arrests to the probation officer when queried about his prior criminal history. The defendant Vargas's responses to inquiries about his drug use also demonstrated a certain willingness to attempt to evade the truth.

Vargas was fully cognizant of the fact that his two-level reduction for acceptance of responsibility was contingent upon his continued cooperation and honesty with the court, a fact which was explained to him in writing, in the plea agreement, and orally during the hearing in which he pled guilty to conspiring to possess cocaine with intent to distribute. In light of his blatant untruthfulness to the probation officer conducting the pre-sentence

---

12. *See, supra,* note 8.

investigation and his lack of remorse for his involvement in the cocaine conspiracy, combined with the deference we pay to the findings of the trial court, we agree with the district judge's determination that the defendant Vargas failed to accept responsibility for his crimes. Thus, we hold that the district court's denial of the two-level reduction was proper and thus, the defendant's argument that the district judge abused his discretion when he refused to grant a two-level reduction for acceptance of responsibility is without merit.

## B. FINES

Vargas and Sanchez both appeal the district court's order directing that their fines be paid out of their prison earnings.[13] The principle argument advanced by the appellants is that the imposition of fines on indigent inmates is a violation of one of the fundamental tenets of the Sentencing Reform Act (18 U.S.C. §§ 3551, *et seq.*) and the Sentencing Guidelines, that of reducing disparity in sentences for conduct similar in nature. According to the defendants, the basis for this disparity is the widely differing levels of compensation earned by inmates employed while in the prison system because under the prison compensation system, two inmates convicted of the same crime and assessed identical fines could suffer disparate economic treatment if they were assigned to jobs with different compensation levels. The inmate who is fortuitous enough to obtain one of the higher paying prison jobs will suffer considerably less of a hardship than the inmate who is required to pay the identical fine out of lesser earnings.

Because the trial judge at the time of sentencing is in no position to accurately predict an inmate's future prison work assignment and earnings, Vargas and Sanchez argue that it should be "impermissible" for a sentencing judge to impose a fine on an indigent defendant to be paid from his or her prison wages because the absence of actual knowledge regarding the inmate's future prison earnings makes disparate treatment of similarly situated indigent defendants unavoidable. Accordingly, Vargas and Sanchez argue that district judges should be prohibited from imposing fines on indigent defendants to be paid from their prison wages until the Sentencing Commission promulgates guidelines to guide the process. We do not agree that the sentencing judge's discretion should be so limited.

Under the Guidelines, the mandatory minimum fine for Vargas's offense level is $15,000 and the mandatory minimum for Sanchez's offense level is $17,500. U.S.S.G. § 5E1.2(c)(3). Sanchez and Vargas were both explicitly informed about the possible fines they were facing in their signed plea agreements which provided:

> [T]he total potential sentence carried under the counts to which [Sanchez] will plead guilty is a mandatory term of at least fifteen years' imprisonment and up to life imprisonment, as well as a $4,250,000 fine, a term of supervised release, and any restitution ordered by the Court.

> [T]he total potential sentence carried under the count to which [Vargas] will plead guilty is a mandatory term of at least ten years' imprisonment and up to life imprisonment, as well as a $4,000,000 fine, a term of supervised release, and any restitution ordered by the Court.

Neither party offered any objections to the maximum fines they might face. Furthermore, both defendants acknowledged that al-

---

13. Fines are imposed pursuant to U.S.S.G. § 5E1.2, which provides, in relevant part:

(a) The court *shall* impose a fine in all cases, except where the defendant established that he is unable to pay and is not likely to become able to pay any fine.

\* \* \* \* \* \*

(e) The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.

(f) If the defendant establishes that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required by the preceding provision, or (2) imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine.

(Emphasis added).

We note that the sentencing judge did not order the defendants to pay restitution because "it appear[ed] that [they] will have no ability to pay restitution and that there appears to be no financial loss to a particular victim."

though the government would recommend the mandatory minimum sentences, that:

> the sentencing judge is neither a party to nor bound by this Agreement and, subject to the limitations of the sentencing guidelines, may impose the maximum penalties as set forth in [the paragraph] above. The defendant further acknowledges that if the court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

At the plea hearings, Sanchez was told that "the total potential sentence carried under the counts to which you intend to plead guilty [includes] ... a fine of $4,250,000," and Vargas was informed that "the maximum fine which can be imposed is $4 million." Both defendants were asked if they understood that they faced these potential fines and both responded "Yes."

■ Thus, in each case the district court departed downward from the Guidelines when imposing the $4000 fines, but the defendants argue that the departure should have been even greater. "It is well settled in this circuit that appellate courts lack jurisdiction to review a defendant's challenge to the extent of a downward departure from an otherwise appropriate sentence." *United States v. Johnson,* 997 F.2d 248, 252 (7th Cir.1993). In the past, we have only seen fit to exercise jurisdiction to review the degree of a departure if "the sentence imposed violates the law or resulted from a misunderstanding of the law." *Id.; see also Gomez,* 24 F.3d at 927 ("an appeal from a sentence founded on a mistake of law is within our jurisdiction even if the dispute concerns the fact or extent of departure"). We review the trial court's rulings on questions of law *de novo. United States v. Boula,* 932 F.2d 651, 655 (7th Cir.1991).

■ This court has upheld the authority of the trial court to order that fines imposed may be satisfied by withdrawing sums of money from the inmate's prison earnings. *Gomez,* 24 F.3d at 926–27; *see also United States v. House,* 808 F.2d 508, 510 (7th Cir. 1986) (indigency does not preclude an award of restitution to be paid from prison wages); *United States v. Fountain,* 768 F.2d 790,

802–03 (7th Cir.), *modified on other grounds,* 777 F.2d 345 (7th Cir.1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). Examining the language of U.S.S.G. § 5E1.2(a) we noted that a "court *shall* impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," and held that "[t]his language is to be taken seriously: the judge *must* impose a fine, unless the defendant demonstrates that he cannot pay *anything,* either at sentencing or in the foreseeable future. Defendant bears a heavy burden, because almost everyone has or will acquire some assets" at some time. *Id.* (citations omitted, emphasis in original). Just as in *Gomez,* where "the district judge observed that [the defendants] are likely to earn wages in prison," so too are Sanchez and Vargas likely to have a future income stream. Thus, if there is such a likelihood, U.S.S.G. § 5E1.2(a) mandates that the trial judge *must* impose a fine as part of the sentence. *Cf., Fountain,* 768 F.2d at 803 ("[t]he point of the order is to make sure that should [the defendants] ever be able to [pay restitution] out of earnings ... they shall do so"). Furthermore, courts can fashion "an installment schedule of payment of the fine" to allow for incremental payment. U.S.S.G. § 5E1.2(g). The guidelines also afford the district court the option of imposing a reduced fine or an alternative punishment to a fine under certain other limited circumstances. U.S.S.G. § 5E1.2(f).

Because we are in agreement with the heavy burden a defendant must bear before he is absolved of having to pay the criminal fines imposed, we observed in *Gomez* that the Inmate Financial Responsibility Program, 28 C.F.R. §§ 545.10 & 545.11, while permitting prisoners to retain the first half of their earned prison wages, 28 C.F.R. § 545.11(b)(2), specifically mandates that the other half of their earnings are assessable for satisfaction of alimony obligations, civil debts, and fines. 28 C.F.R § 545.11(a)(3). Accordingly, we held that

> [n]either the text of the regulations nor any of defendants' argument suggests that funds available to pay civil debts should be unavailable to pay criminal debts. Prison-

ers have no inherent right to chocolate bars and other snacks; we have accordingly held that trust accounts may be tapped to pay restitution. Just so with fines.

*Gomez,* 24 F.3d at 927 (citing *House,* 808 F.2d 508, and *United States v. Tosca,* 18 F.3d 1352, 1355 (6th Cir.1994)).

Notwithstanding our decision in *Gomez,* Vargas and Sanchez argue that prison wage garnishment for the purpose of making an indigent defendant pay a criminal fine is improper and contrary to the intent of the Guidelines. In essence, the appellants are trying to limit the scope of *Gomez,* and argue that our holding in that case is not applicable to indigent defendants. We reject their attempt to narrowly proscribe the very clear language of *Gomez,* and hold that the principle enunciated therein, namely that prison wages can be garnished to pay prisoners' fines, is applicable to Vargas and Sanchez.

### 1. *Sentence Impact Disparity*

■ The defendants initially contend that prison wage garnishment has the potential to produce "disparate impacts" on inmates sentenced for committing identical offenses. According to the defendants, this disparity arises from the sliding scale of inmate wages. Thus, for example, two inmates serving identical terms of confinement and having had similar monetary fines imposed, but earning different wages as a result of different work assignments, will suffer disparate degrees of hardship during the period the fine payments are deducted from their wages. The inmate

at the lower wage may very well suffer greater hardship while incarcerated than the prisoner with the higher wage because he will be left with less money in his prison trust account following the deduction of the fine payment.

We reject this novel "disparate impact" argument because the Sentencing Reform Act charges sentencing courts with responsibility to avoid *sentencing* disparities,[14] not sentencing *impact* disparities.[15] It is intuitive that the former objective is amenable to court action while the latter involves factors that are beyond the control of the sentencing judge. We note that the defendants in this case were convicted of different offenses and that although they both had criminal history categories of I, they had different criminal history records, a factor that should and usually does have an impact on defendants' sentences. Further, the sentence imposed is impacted by the individual inmate's adjustment to his prison surroundings, including the restraint on his or her freedom that comes with it, and that he or she will have very limited contact with his relatives, and probably none with friends, other than through the telephone or the United States mail.

For example, appellant Sanchez is single, whereas appellant Vargas is married with two children. Disparity is inevitable because separation from one's siblings, parents, spouses or children each has its own different effects. However, such separation is not a factor about which the court is in any position to remedy once the decision to incar-

---

**14.** 18 U.S.C. § 3553(a)(6) provides:

The court, in determining the particular sentence to be imposed, shall consider—

\* \* \* \* \* \*

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

**15.** The Senate Report on the Comprehensive Crime Control Act of 1984 is useful for analyzing the purposes behind the sentencing reform provisions of this legislation. 1984 U.S.C.C.A.N. 3182. In it, the Senate stated that a "primary goal of sentencing reform is the elimination of unwarranted sentencing disparity," *id.* at 3235, and that the Sentencing Reform Act was designed to combat the fact that "every day Federal

judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances." *Id.* at 3221. There is no mention in this report of a Congressional concern over similar punishments having disparate impacts on the convicted defendants. In fact,

[t]he Committee does not intend that the guidelines be imposed in a mechanistic fashion. It believes that the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case. The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences.

*Id.* at 3235.

cerate is made, other than to recommend the placement of that particular inmate in facilities most adapted to his or her particular needs and usually where family members can visit. Furthermore, prisoners who earn wages have the opportunity to purchase certain amenities such as candy bars, cigarettes, magazines, papers, and toiletries. Because these amenities might be of more importance to one than the other, the two prisoners might very well spend varying amounts of money on such items, causing a disparity in the amount of money they save while in prison. Thus, elimination of this type of disparity is not within the power of the court, although it is within the control of the inmate, nor is it our concern for these types of disparities are a natural and logical consequence of life compounded by incarceration. No one in their right mind ever said that prison should be easy, for it is supposed to be a restraint on one's freedom as well as his enjoyment of the better things of life for a definite period of time.

Differentials in prison wages are unavoidable, just as they are in everyday life. Prison job assignments are distributed based upon the inmate's abilities, interests, and eligibility, 28 C.F.R. § 545, *et seq.*,[16] and compensation varies according to the particular job assignment, the prisoner's job skills for the type of industry at that particular institution, and the inmate's job performance. In addition, the Bureau of Prisons regulations allow for bonus pay, merit pay, achievement awards, special awards and vacation. *Id.*[17] Admittedly, two prisoners assessed the same monetary fine but assigned to different levels of prison work are subject to disparate economic impacts when the fines are deducted

from their prison income, but as we have explained, the courts do not and should not have control over these disparities, for this is a matter for prison authorities. *Cf., Bell v. Wolfish,* 441 U.S. 520, 544, 99 S.Ct. 1861, 1876–77, 60 L.Ed.2d 447 (1979).

We do not agree, nor have the defendants' presented any authority to support their contention, that in passing the Sentencing Reform Act, Congress charged the Sentencing Commission with the task of developing a scheme that equalized, or even considered, such factors as vocational ability in order to avoid "disparate impacts" arising from the imposition of fines. We are aware of no language, nor have counsel presented us with any such language in the Sentencing Reform Act, much less case law, that supports their contention that judges do not have the authority to impose fines on indigent prisoners to be paid out of their prison wages. Instead, Vargas and Sanchez ask this court to infer an alleged Congressional intent of reducing sentencing disparity is to be interpreted as embracing the alleged objective of reducing the disparate impacts felt by similarly sentenced defendants. This is an inference we refuse to accept in light of the Senate Report which espouses the virtues of individualized sentences. *See* 1984 U.S.C.C.A.N. 3182, at 3235.

Assume, for the sake of argument, that the district court imposed identical sentences on both defendants in this case and neither defendant was fined. In accordance with Bureau of Prison guidelines, each of them were given a job assignment in prison adapted to the individual's particular needs, including,

---

**16.** 28 C.F.R. § 545.23(d) provides:
> In making the work and/or program assignment(s), staff shall consider the inmate's capacity to learn, interests, requests, needs, and eligibility.

28 C.F.R. § 545.50 defines the UNICOR program:
> Federal Prison Industries, Inc. (UNICOR), provides inmates confined in Bureau of Prison institutions an opportunity to obtain a work assignment within each institution's industrial location.

28 C.F.R. § 545.51 discusses the procedures for placing inmates in the UNICOR program. The regulations require the maintenance of a waiting list from which inmates are to be selected for the

UNICOR assignments as they become available. However:
> (c) The Warden or designee may make an exception to either paragraph ... of this section when there exists a supported need for a specific skill. When this occurs, an inmate with that skill, regardless of position on the list, may be hired to fill the vacancy, at the position's existing grade level.

**17.** "An inmate who has worked full-time for 12 consecutive months on an institution work assignment is eligible to take a five-day paid vacation at the inmate's prevailing hourly rate." 28 C.F.R. § 545.27(a).

but not limited to, his skills, aptitude, interests, and abilities. Assume also that one excels and is a more dedicated worker, excels in his job performance, and earns additional bonus pay. As a result of the combined effects of the differential based upon job assignment, different work skills, and the bonus pay, one defendant ends up with significantly higher wages than the other. Both were sentenced to identical periods of confinement, neither defendant was fined, yet a disparate impact has resulted because one defendant has earned more money for his account than the other while enjoying all the amenities and conveniences this additional money provides.

Note that this hypothetical encompasses the disparate impact solution proposed by the appellants in this case, elimination of the fine, yet the two defendants still experience a disparate economic impact. Disparate impacts of varying degrees are unavoidable. The appellants cite no authority for their theory that disparate impacts are impermissible under the Guidelines. In fact, if we were to follow the defendants' argument to its logical conclusion, then the courts could never impose fines because of unavoidable disparities in prison job assignments and individual talents and skills are inevitable. Yet we know that this conclusion is neither accurate nor valid vis a vis the imposition of penalty fines because Congress specifically provided for the payment of fines, in fact it mandated payment of the same except in exceptional circumstances. Clearly, the legislative history and provisions in the Guidelines prove that it is disparity in sentencing that the Sentence Reform Act sought to ameliorate, not "impact" disparity. Therefore, based upon the reasoning, case law and statutes set forth herein, we hold that prison authorities may withdraw money from the wages of indigent prisoners, upon the receipt of a proper court order to do so, in order to pay the inmate's criminal fines.

### 2. Guideline Authorization

■ Sanchez's and Vargas's next argument is that because imposition of fines on indigent inmates, to be paid during and after confinement, is not expressly authorized in the Guidelines, it should not be left to the district courts "to fashion ingenious devices to reduce the inherently inequitable affect of fines on indigent inmates." Rather, they argue that it is up to the Sentencing Commission to develop guidelines specifically devised for purposes of fining indigent inmates. In the absence of such guidelines, Vargas and Sanchez contend that it should be "legally impermissible" for district courts to impose fines on indigent inmates.

In support of this argument, the defendants cite to Congressional legislation enacted several years after the Guidelines instructing the Sentencing Commission to "study the feasibility of requiring prisoners incarcerated in federal correctional institutions to pay some or all of the costs incident to the prisoner's confinement." Section 7301 of Pub.L. 100–690, 102 Stats. 4463 (1988). Sanchez and Vargas somehow interpret this language as indicating a Congressional intent that fines not be imposed on indigent inmates until such time as the Sentencing Commission conducts empirical feasibility studies. Notwithstanding the observation that § 7301 concerns payment of the costs of incarceration and the case at bar deals with criminal fines, this court has previously interpreted § 7301 as expansive in scope relative to the sentencing guidelines, not restrictive. *United States v. Turner*, 998 F.2d 534, 537 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 639, 126 L.Ed.2d 598 (1993).[18] The cost of imprisonment is extremely high, and certainly it is not improper for the government to attempt to recoup some of the costs of convicting a person and incarcerating them in a federal institution, just as many states have done. *See, e.g.*, I.L.C.S. § 5/5–9–1 (Smith–Hurd 1995); Wis.Stat. §§ 939.12 & 973.05 (1995). Thus, appellants' argument that § 7301 is to be interpreted as restricting

---

18. In *Turner*, we concluded that § 7301 did not restrict the Sentencing Commission to merely "studying" the feasibility of requiring inmates to pay for some or all of the costs of their incarceration. In so holding, we noted that § 7301 did not "subtract from any of the Commission's permanent legislation, and we all know the canon that repeals by implication are disfavored." 998 F.2d at 537.

a sentencing judge's power to impose a fine on an indigent inmate is not persuasive. If Sanchez and Vargas wish to persist in their arguments, they should take them to the halls of Congress. Congress enacts legislation; we the court merely interpret it.

### 3. Duration of Installment Payments

█ Sanchez and Vargas also argue that their fines were improperly imposed because the installment period for repayment of the loan exceeded the suggested twelve month limit described in § 5E1.2(g) of the Sentencing Guidelines,[19] and is contrary to the Sentencing Reform Act. However, the Act, 18 U.S.C. § 3572 provides:

(d) A person sentenced to pay a fine or other monetary penalty shall make such payment immediately, *unless, in the interest of justice, the court provides for payments on a date certain or in installments. If the court provides for payment in installments, the installments shall be in equal monthly payments over the period provided by the court, unless the court establishes another schedule.* If the judgment permits other than immediate payment, the period provided for shall not exceed five years, excluding any period served by the defendant as imprisonment for the offense.

(Emphasis added).[20]

Congress's language makes clear the fact that district judges have the discretion to fashion installment payments that extend beyond the twelve month suggestion contained in U.S.S.G. § 5E1.2(g). Courts may provide for incremental payment schedules which have a duration of up to the number of years in confinement plus the first five years after release. When U.S.S.G. § 5E1.2 is read in conjunction with the Sentencing Reform Act, it becomes apparent that the immediate payment of the entire amount of an imposed fine is preferred over installment payments because payment of the entire amount immediately upon the imposition of the sentence no doubt advances the punitive goals of the Guideline's provisions calling for fines.[21] U.S.S.G. § 5E1.2(e) ("The amount of the fine should always be sufficient to insure that the fine, taken together with other sanctions imposed, is punitive").

Thus, the provision allowing for installment payments of the fine is to be extended to a defendant only when he is able to demonstrate that a lump sum has an "unduly severe impact" on him. U.S.S.G. § 5E1.2(g). The language of the passages cited above makes it abundantly clear that the purpose of the short duration installment period of twelve months was to make payment by installment as punitive as possible and to ensure that the fine is collected in a timely fashion.

Furthermore, the Guidelines state that the installment period "generally should not" exceed twelve months; however, when payment

**19.** U.S.S.G. § 5E1.2(g) provides:
If the defendant establishes the payment of the fine in a lump sum would have an unduly severe impact on his or her dependents, the court should establish an installment schedule for payment of the fine. The length of the installment schedule generally should not exceed 12 months, and shall not exceed the maximum term of probation authorized for the offense. The defendant should be required to pay a substantial installment at the time of the sentencing. If the court authorizes a defendant sentenced to probation or supervised release to pay a fine on an installment schedule, the court shall require as a condition of probation or supervised release that the defendant pay the fine according to the schedule. The court also may impose a condition prohibiting the defendant from incurring new credit charges or opening additional lines of credit unless he is in compliance with the payment schedule.

**20.** We also note that should the defendants fail to pay the remainder of their fines during the period of supervised release, the United States may have a lien on the defendants' property imposed in its favor until the fine is paid pursuant to 18 U.S.C. §§ 3612 & 3613.

**21.** Congress amended § 3572(d) in 1987 with Public Law 100–185. Pub.L. 100–185, § 7, Dec. 11, 1987, 101 Stat. 1280. The legislative history accompanying this act indicates that the law was changed from the passive to the active voice to insure that when the judge is silent regarding the time of payment for an imposed fine the fine would be due immediately. 1987 U.S.Code Cong. and Adm.News, p. 2137, at 7. Clearly, this amendment illuminates Congressional preference for immediacy of payment, presumably for punitive reasons and because of concerns over collectibility.

of the fine over a twelve month period is impractical, and when the defendant faces a lengthy period of incarceration during which he is likely to be earning wages, extension of the installment period is an outcome to be preferred over waiver of the fine. Additionally, we have previously examined this provision of the Guidelines and stated that the word " 'generally' is a plastic term," *i.e.,* a term which gives the sentencing judge considerable discretion in fashioning fines, and not one that merits our intervention to carefully scrutinize fine schedules. *Gomez,* 24 F.3d at 927. The Guidelines specifically authorize the use of an incremental payment schedule and we refuse to vacate the fines merely because the defendants read Congress' flexible language in a rigid manner.

■ Sanchez's and Vargas's next argument is one in which they try to analogize probation to supervised release. Their argument fails for a number of reasons, but most importantly because they try to conflate two distinct punishments that have entirely different theories and goals of punishment. Probation is a "sentence in and of itself," and is an *"alternative* to incarceration," U.S.S.G. § 5B1.1, Introductory Comment (emphasis added), whereas supervised release *follows* imprisonment. U.S.S.G. § 5D1.1. The two sentence options are mutually exclusive.

Therefore, when Vargas and Sanchez argue that because the statutes under which they were convicted do not authorize a sentence of probation, any installment fine imposed which may be paid during their period of supervised release contravenes that portion of U.S.S.G. § 5E1.2(g), which provides that the installment schedule "shall not exceed the maximum term of probation authorized for the offense," they misinterpret the Guidelines. Since a plain reading of the Guidelines demonstrates that because the statutes under which the defendants were convicted do not allow for a sentence of probation, the probationary installment term

limitation of § 5E1.2(g) is inapplicable to Sanchez and Vargas. If the offense does not provide for a probation sentence, there is no maximum term of probation against which the installment period may be measured. The absence of an authorized probation term represents the absence of this limitation, not an installment term proscription. Therefore, we hold that the district court's installment payment plan was proper, even though it had the potential to extend into the defendants' periods of supervised release.[22]

### 4. *Amount and Timing of Payments*

Finally, appellants contend that the district court impermissibly delegated the timing of their payment schedules and amount of their fines to the Bureau of Prisons. They base this argument on our decision in *United States v. Ahmad,* in which we held that a district court judge is without authority under the restitution statute to delegate the specification of a restitution payment schedule to a probation officer. 2 F.3d 245, 248–49 (7th Cir.1993). We need not address whether *Ahmad* is binding on fine installment determinations because we hold that under the facts of this case, the district court did not delegate the amount or timing of the installment payments to the Bureau of Prisons.

The district court ordered each defendant in this case to make installment payments equalling one-half of his monthly prison wages, during his period of incarceration, provided their wages exceeded a specified minimum amount.[23] This arrangement does not delegate the authority to determine either the timing or amount of payments to the Bureau of Prisons. The timing of the payments is clearly specified in the court's order; payments are to be made when the monthly wages exceed the specified minimums. Similarly, the amounts to be paid are specific and unambiguous; one-half the monthly earnings over and above $50 per month for Sanchez and $40 per month for Vargas. This is not a

---

**22.** *See, supra,* note 20.

**23.** We note that the district court imposed very definite restrictions on the deductibility of the fines from each of the defendant's wages in a fashion that was designed to lessen the economic hardship to the defendants. Neither Vargas' nor

Sanchez's wages will be garnished until they exceed a specified amount within a given month, thereby insuring that each will retain a minimum amount in his trust account for personal use, free of attachment.

delegation of the determination of either the timing or amount of payments.

## IV. CONCLUSION

The only question remaining is whether the amount of the fines was proper. "Having decided that prison wages are available in principle to pay fines, we have no authority to inquire into the precise amount of the fine the district judge specified," because claims "that the judge should have made a greater departure ... [are] outside our jurisdiction." *Gomez*, 24 F.3d at 927 (citation omitted). The district court was within its discretion, and committed no error, when it fined both defendants and when it denied Vargas a two-level reduction for acceptance of responsibility.

The district court is AFFIRMED.