United States Court of Appeals,

Eleventh Circuit.

Nos. 94-6141, 94-6152.

UNITED STATES of America, Plaintiff-Appellee,

v.

David G. PRICE, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

John G. PRICE, Defendant-Appellant.

Sept. 29, 1995.

Appeals from the United States District Court for the Middle District of Alabama. (No. CR-93-57-N), Ira De Ment, Judge.

Before COX, Circuit Judge, RONEY and WOOD[*], Senior Circuit Judges.

PER CURIAM:

John and David Price were convicted for conspiracy, in violation of 18 U.S.C. § 371 (1988), to commit murder and for the use of interstate commerce facilities in violation of 18 U.S.C. § 1958 (1988), with the intent to commit murder-for-hire. John Price was also convicted of solicitation to commit a crime of violence in violation of 18 U.S.C. § 373 (1988), while David Price was separately convicted for using interstate commerce facilities in violation of 18 U.S.C. § 1958 (1988), with the intent to commit murder-for-hire.[1] John Price was sentenced to 360 months imprisonment and fined. David Price was sentenced to 300 months in

---

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

[1]Both Prices were charged with tampering with witnesses, in violation of 18 U.S.C. § 1512(b)(2)(A) (1988), but were acquitted on those two counts.

prison and was ordered to pay fines as well.  The Prices appeal, challenging their convictions and their sentences.  We affirm their convictions but vacate their sentences and remand for resentencing.

## I. FACTS AND PROCEDURAL HISTORY

John Price was president of Price Rubber Corporation, a business headquartered in Montgomery, Alabama.  His son David managed a Texas rubber plant owned by the company.  Several business-related incidents gave rise to the convictions now at issue.

Before establishing operations in Montgomery, John Price owned a rubber warehouse and distribution center in Auburn, Georgia. That facility burned in 1974, causing Price a three million dollar uninsured loss.  The Prices have always believed that Auburn resident David Hawthorne was responsible for the arson.  Nothing came of their suspicions for a time, however, because shortly after the fire, the Prices left Auburn and moved to Montgomery to found Price Rubber.

The Prices acquired more perceived enemies when, in 1986, Sy Shafer and Ellis Lucas sold their printing concern, Pioneer Press, to Kenny Price, John Price's nephew.  Kenny was affiliated with the Prices' enterprise, and he ran the printing business "parallel" to the principal rubber operation.  (Gov't Ex. 6 at 17-18.)  Shafer and Lucas retained Leon Capouano, a Montgomery lawyer, to handle the sale of Pioneer Press.

The acquisition proved troublesome for the Prices.  The parties to the deal became involved in litigation, and ultimately

Shafer and Lucas obtained a money judgment against Pioneer Press and Kenny Price. Litigation continued through 1992; Sy Shafer had filed two suits directly against John Price by the fall of 1991. Family relations turned so sour that John Price fired nephew Kenny, on the belief that he was stealing from the company. After his severance from the Price empire, Kenny became a prospective witness for Sy Shafer against his uncle.

Further problems arose for Price Rubber in 1991, when Internal Revenue Agent Dwight Huff initiated an examination of the company's tax records. Though routine, the review spanned the next two years, in part because of the failure of Price Rubber to timely provide information necessary for the audit's completion.

Not fond of lawyers, John Price and his son David decided to bypass legal recourse and deal with their woes through a sinister plot to pay back their perceived enemies by hiring hitmen to wreak various degrees of havoc upon them. Bobby Price (unrelated to, but acquainted with John and David Price) was the Prices' initial contact with the underworld.[2] In November, 1991, David Price visited Bobby's auto body shop in Montgomery. At this meeting, David handed Bobby $2000 and instructed him to find "the right people" to blow up Leon Capouano's law office and to kill David Hawthorne in Auburn, Georgia. (R. 18 at 329.) Later, David mailed Bobby two packages which contained maps, photographs, and other information about Capouano and Hawthorne. The second parcel also contained a note indicating that David Price had two more names to

---

[2]Bobby Price had worked for the Prices during 1983-1984 and again during 1987. During those times, Bobby knew both Prices and had become friends with David Price.

add to the "hit list," apparently Kenny Price and Sy Shafer.

Meanwhile, Bobby Price was arrested July 8, 1992, for trafficking in marijuana. In exchange for a lighter sentence, Bobby struck a deal with the government, eventually providing information about the Prices' murder-for-hire plot.[3] After his agreement with the government, the federal agents orchestrated a meeting on August 14, 1992, between Bobby Price and David Price, during which David told Bobby that Kenny Price and David Hawthorne were still prime targets. David also took Bobby out to Elmore County, Alabama, to "case" Kenny's trailer. David paid Bobby $1500, and Bobby explained that he had two friends (FBI special agents) who would be willing to do these jobs for the Prices.

One week later, Bobby had a similar meeting with John Price. There, John expressed his desire to have Kenny "busted up pretty good," (Gov't Ex. 2 at 59), though he expressed hesitation about killing his nephew outright. As for David Hawthorne, John stated that "the guy needs to be rubbed out. No question about that." (*Id.* at 62.)[4]

By September 16, Bobby had introduced David Price to the

---

[3]Bobby provided information regarding drug traders in the Montgomery area during "debriefing sessions" held in July, 1992. He did not mention John and David Price until August 4, 1992, after the debriefing agents demanded to know about phone calls made to Arlington, Texas. (R. 18 at 339-42.) Those calls were to David Price and concerned the activities at issue in this case.

[4]John Price was more reluctant than his son to order the murder of their targets. Instead, he graphically described how he would rather have them mutilated, so that they would have to live with the damage for the rest of their lives. Still, John Price was at best indifferent to his targets' survival: "... if [Hawthorne] should ... should die I don't give a shit...." (Gov't Ex. 2 at 66; Gov't Ex. 6 at 24-25.)

undercover FBI agents, and meetings between the participants continued through the fall of 1992. During these meetings, the murders of Kenny Price, David Hawthorne, and Sy Shafer, as well as the bombing of Leon Capouano's law office, were planned and paid for by John and David Price.[5] Finally, John Price sent a letter to the agents in January, 1993, requesting the "well damaged carcass" of IRS agent Dwight Huff, in retaliation for the inconvenience caused by the audit of Price Rubber. (Gov't Ex. 63.)

The last meeting between the federal agents and John Price occurred on January 27, 1993, in Montgomery. There the agents told Price that the first murder, that of Sy Shafer, had been completed, and they showed him pictures of what they said was the body. John Price paid the agents $20,000 and expressed enthusiasm about the imminent success of the remaining jobs. Later that day, he and son David were arrested.

A grand jury in the Middle District of Alabama indicted the Prices jointly, and the case went to trial in June, 1993. The Prices were acquitted on two counts of witness tampering, but the jury was unable to reach a verdict on the other counts. As a result, a mistrial was declared as to those counts. Retrial began in July, 1993, and the jury returned guilty verdicts against both defendants on the remaining charges. The Prices filed a motion for a new trial, which alleged, among other things, that juror

---

[5]The Prices' plans became more grandiose as time passed. By December, 1992, John Price sent the agents a "menu" of possible services for the agents to perform and the payments he would make for each. (R. 17 at 189-92.) Later, Price referred back to the menu to describe what he wanted done to two attorneys, Dennis Pentazis and Tim Davis, who were involved in litigation against him. (R. 17 at 198; 18 at 230.)

misconduct deprived them of a fair trial.  The court questioned the jurors *in camera* to investigate the alleged improprieties, and some instances of misconduct were found.  The judge ruled that none of the incidents prejudiced the defendants' rights and denied the motion for a new trial.

David Price was sentenced to a total of 300 months in prison, a period of supervised release, and was fined $726,712.40, which included a fine of $200,000 and costs of incarceration and supervision.  David was also ordered to pay a $200 assessment and restitution of $350 to Leon Capouano.  In calculating David Price's sentence, the court applied an upward adjustment based on its finding that he obstructed justice by giving false testimony at trial.  *See* United States Sentencing Commission, *Guidelines Manual* § 3C1.1 (Nov. 1992).

John Price's sentence consisted of a total of 360 months in prison and a period of supervised release.  Additionally, John Price was fined $880,752.40, comprised of a $250,000 fine and costs of incarceration and supervision.  He was also ordered to pay $350 in restitution to Capouano.

In calculating both Prices' sentences, the trial judge found that a two-level upward departure was warranted because of the racial and ethnic motivation behind the crimes, the severe psychological injury to the victims, and the threat of harm to third parties.  The Prices appealed.

## II. ISSUES ON APPEAL

The Prices raise several issues on appeal.  They contend that: (1) the trial court's denial of their motions for acquittal was

erroneous because they were entrapped as a matter of law; (2) the trial court's imposition of cost-of-confinement fines violated the Fifth and Eighth Amendments to the Constitution; and (3) the court misapplied the sentencing guidelines when it calculated their sentences.[6]

## III. DISCUSSION

A. *Entrapment*

The Prices invite us to overturn their convictions, arguing that the district court should have granted their motions for acquittal because the government's evidence was insufficient to negate their entrapment defense. Their argument on this issue

---

[6]The Prices also argue that the trial court improperly denied their motions for a new trial after allegedly prejudicial juror misconduct was discovered. They further claim that the trial court abused its discretion in the manner in which it conducted its investigation of the possible misconduct.

The Prices allege several acts and omissions by the trial court which they contend deprived them of a fair trial. They claim that: (1) the trial court's entrapment instruction was inadequate; (2) the trial court erred by removing from evidence the Attorney General's Guidelines on FBI Undercover Operations; (3) the court erred by not allowing the defense to have an unredacted copy of informant Bobby Price's diary; and, (4) the diary and other information were required to be disclosed under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). They also attack the trial court's admission into evidence of a photograph containing inflammatory racial and ethnic matter, the trial court's instruction given to remedy "improper" remarks made by the prosecutor, and, finally, the judge's failure to recuse himself prior to sentencing because of death threats purportedly made by the Prices.

David Price separately argues that it was error for the district court to enhance his sentence under U.S.S.G. § 3C1.1 on the ground that Price obstructed justice by perjuring himself during the trial.

All these contentions are without merit and do not warrant further discussion. *See* 11th Cir.R. 36-1.

fails.

Entrapment is generally a jury question. *United States v. Brown,* 43 F.3d 618, 622 (11th Cir.1995) (citing *Mathews v. United States,* 485 U.S. 58, 61, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Costales,* 5 F.3d 480, 487 (11th Cir.1993)). Therefore, appellate review of a defendant's contention that he was entrapped as a matter of law is a sufficiency of the evidence inquiry, limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit activity. *Brown,* 43 F.3d at 622 (citing *United States v. Aibejeris,* 28 F.3d 97, 99 (11th Cir.1994)). Review is de novo, but we must view all facts and make all inferences in the government's favor. *Id.* (citing *Aibejeris,* 28 F.3d at 98). We cannot overturn a verdict if any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt. *Id.* (citing *United States v. Ventura,* 936 F.2d 1228, 1230 (11th Cir.1991)).

A valid entrapment defense consists of two elements: government inducement and the defendant's lack of predisposition to commit the crime prior to the inducement. *Mathews,* 485 U.S. at 63, 108 S.Ct. at 886 (citations omitted). While the burden of production rests with the defendant to show inducement, once that showing is made, the burden shifts to the government to prove beyond a reasonable doubt that the accused was predisposed to commit the crime. *Brown,* 43 F.3d at 623.

To establish government inducement, an "element of persuasion or mild coercion" is necessary. *Id.* In this case, there are

numerous instances of government attempts to persuade or pressure John and David Price to commit the crimes they planned. For example, Bobby Price invoked his relationship with the Prices in offering to pay them back for past favors by arranging the murders of the Prices' enemies. A reasonable jury could have believed that such pressure induced the Prices to put their schemes in motion, so the court properly decided to charge the jury on entrapment.

The flaw in the Prices' argument is their contention that no reasonable jury could conclude that they were predisposed to engage in their murder-for-hire plot. They argue that they were not "disposed" to commit the crimes charged until after the initial contact with government agents. The Prices correctly assert that "one may not become unentrapped when the disposition arises after entrapment," (Appellant John Price's Br. at 24), and they claim, based on excerpts from the conversations they had with Bobby Price and the FBI agents, that they were reluctant to take part in the murder-for-hire scheme until after government persuasion.

Predisposition is "necessarily a fact-intensive inquiry because it is a subjective inquiry into a defendant's state of mind." *Brown,* 43 F.3d at 625 (rejecting five-factor list used by other circuits in reviewing predisposition in favor of case-by-case analysis). To show predisposition, the government must prove beyond a reasonable doubt that "the defendant was *actually* predisposed to commit the underlying crime absent the government's role in assisting such commission." *Aibejeris,* 28 F.3d at 99 (citing *Jacobson v. United States,* 503 U.S. 540, 547-49, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992)); *see also Brown,* 43 F.3d at

624-25 (endorsing approach based on defendant's "readiness and willingness" to commit the crime; listing several "guiding principles" to use in reviewing predisposition findings, such as jury consideration of demeanor and credibility evidence).

We cannot say that the evidence was insufficient for the jury to conclude beyond a reasonable doubt that the Prices were predisposed to commit the crimes of which they were convicted. While some statements made by both John and David Price suggest hesitation to go as far as murder, there are other indications of their readiness and willingness to have their perceived enemies maimed or killed. Significantly, David Price met with Bobby Price and made the first "downpayment" for their series of "hits" in November, 1991, long before Bobby became a government agent. In negotiating with the FBI agents about their fees, both John and David Price made reference to payments previously given to Bobby. This further suggests that the Prices' disposition arose before government agents allegedly pressured them to discuss murder.

B. *Sentencing Issues*

The Prices attack several aspects of their sentences. They argue that the fines imposed to pay for costs of incarceration and supervision are unconstitutional, and they also contest the two-level upward departure that the trial judge found was merited because of the nature of the Prices' plans and actions.

1. Cost-of-Confinement Fines

The Prices argue that the fines levied upon them pursuant to U.S.S.G. § 5E1.2(i) to pay for costs of incarceration are excessive under the Eighth Amendment and violate due process under the Fifth

Amendment because they are not rationally related to the purposes of the Sentencing Reform Act.  The Prices argue that U.S.S.G. § 5E1.2(i), which provides for cost-of-incarceration fines, and 18 U.S.C. § 3553(a) (1988), which states that courts shall "impose a sentence sufficient, but not greater than necessary," are in conflict, since § 5E1.2(i) imposes an "additional" fine on top of the fine ranges contained in the table provided by § 5E1.2(c). [7] The government, on the other hand, asserts that the fine is neither excessive nor irrational.  Such questions of law are subject to plenary review.  *See United States v. Weaver,* 920 F.2d 1570, 1573 (11th Cir.1991).

The validity of U.S.S.G. § 5E1.2(i) is an issue of first impression in this circuit, and other circuits are split on the question.  *Compare United States v. Spiropoulos,* 976 F.2d 155, 165-67 (3d Cir.1992) (holding § 5E1.2(i) to be inconsistent with Sentencing Reform Act while avoiding due process question) *with United States v. Hagmann,* 950 F.2d 175, 187 (5th Cir.1991), *cert. denied,* --- U.S. ----, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992)

---

[7] The Prices argue that such a fine is by definition excessive under the Eighth Amendment.  We reject their argument.  The penalties levied on the Prices are neither excessive nor grossly disproportionate to the crimes committed, *see Alexander v. United States,* --- U.S. ----, ----, 113 S.Ct. 2766, 2770, 125 L.Ed.2d 441 (1993); *United States v. Elkins,* 885 F.2d 775, 789 (11th Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990), and so pass muster under the Eighth Amendment.  Indeed, a fine based on a criminal's stay in prison seems to be by definition proportional to the crime committed.  The Prices also argue that it is excessive to require them to pay for their imprisonment costs when they have yet to incur them.  This argument is beside the point as well, since the fines are meant to penalize their criminal actions, not to pay the bills as they accrue while in prison.  Also, the money will go not to their prison facilities but to the Crime Victims Fund, 42 U.S.C. §§ 10601 to 10603 (1988).

(finding that cost-of-incarceration fines are rational means to assist victims of crime collectively). In declaring guideline § 5E1.2(i) invalid, the Third Circuit found that the plain language of the section indicated that the fines imposed thereunder were to reimburse the government for the costs of imprisonment. *Spiropoulos,* 976 F.2d at 166. The court concluded that the Sentencing Reform Act did not authorize fines to cover costs of confinement, even though the money collected from the fines went to the Crime Victims Fund and not actually to pay for penal operations. *Id.* at 166-67.

We disagree with the assertion that Congress did not consider imposition of cost-of-confinement fines to be within the scope of the Sentencing Reform Act's goal of restitution. *See* 18 U.S.C.A. § 3572(a)(6) (West Supp.1995) (providing that courts can consider "the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence" in setting amount of fine); 28 U.S.C.A. § 994(y) (West Supp.1995) (stating that Sentencing Commission may include as component of fine calculus the expected costs of imprisonment). Instead, we find *Hagmann* to be persuasive. We agree with the Fifth Circuit that "the uniform practice of fining criminals on the basis of their individualistic terms of imprisonment—an indicator of the actual harm each has inflicted upon society—is a rational means to assist the victims of crime collectively." *Hagmann,* 950 F.2d at 187.

Although the Third Circuit in *Spiropoulos* found the analysis in *Hagmann* to be "too facile," 976 F.2d at 168, *Spiropoulos* has

been rejected, and *Hagmann* followed, in every other circuit that has addressed the issue. *See, e.g., United States v. Zakhor,* 58 F.3d 464, 466 (9th Cir.1995) (upholding cost of confinement fines); *United States v. May,* 52 F.3d 885, 891 (10th Cir.1995) (finding guideline rationally related to legitimate government interest); *United States v. Leonard,* 37 F.3d 32, 39 (2d Cir.1994) (citing *Hagmann* and holding § 5E1.2(i) consistent with 18 U.S.C. § 3553(a)); *United States v. Turner,* 998 F.2d 534, 538 (7th Cir.1993) (holding that § 5E1.2(i) is authorized by statute), *cert. denied,* --- U.S. ----, 114 S.Ct. 639, 126 L.Ed.2d 598 (1993). We join the other circuits that have upheld U.S.S.G. § 5E1.2(i), and we reject both constitutional challenges made by the Prices.

2. Upward Departure Granted by the District Court

The trial court found that the Prices' crimes went beyond the "heartland" of typical cases, *see* U.S.S.G. § 5K2.0, and departed upward by two levels from the applicable guidelines in calculating their sentences. (R. 31 at 103.) In deciding that this case merited departure, the court found that three aspects of the Prices' activities were not adequately considered by the guidelines: (1) their extreme conduct, including the fact that harassment of Leon Capouano was motivated by racial and ethnic prejudice, and that the Prices planned to mutilate IRS agent David Huff; (2) the risk of harm to innocent bystanders because of the plan to blow up Capouano's law firm; and (3) the extreme psychological injury to Kenny Price and other victims.[8] The court treated these factors as a group, assigning no relative weight to

---

[8](R.Ex. 210 at 6 (John Price), 208 at 6 (David Price).)

one factor over another in making the decision to depart from the guidelines.  The Prices challenge the departure, arguing that the sentencing guidelines adequately considered all aspects of their crimes, and that there was insufficient factual support for the trial court's findings.  The government originally moved for a four-level departure, but on appeal urges us to affirm the two-level departure as reasonable.

In sentencing determinations, a court may impose a sentence outside the range established by the guidelines, if the court finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b) (1988).  We review such departures by applying a three-step analysis.  *United States v. Dailey,* 24 F.3d 1323, 1325 (11th Cir.1994) (citing *Weaver,* 920 F.2d at 1573).  We review de novo a decision as to whether the guidelines adequately consider a particular factor so as to preclude a sentencing court's reliance on it as a basis for departure.  *Id.*  Second, we review the factual findings underlying the trial court's decision to depart for clear error.  *Id.*  Finally, we review the departure itself for reasonableness.  *Id.; accord United States v. Passmore,* 984 F.2d 933, 937 (8th Cir.1993) (holding that extent of upward departure is a "judgment call" by district court).  We deal with each factor relied upon by the trial court in turn.

a. Extreme conduct (racial/ethnic motivation for crimes;  planned mutilation of victims)

The Prices do not challenge the trial court's determination

that racist or anti-semitic motivation for a crime was a proper basis for departure.[9]  Instead, they argue that their actions were not racially or ethnically motivated, and that it was clear error for the trial court to find that they were.  Our review, then, is limited to determining whether the trial court's factual findings are clearly erroneous.

We find no clear error in the trial court's finding that the Prices were motivated by ethnic hatred in their harassment of Leon Capouano.  While it is true that the court, as well as the government, acknowledged that two primary motivators for the Prices' conduct were greed and business litigation, the trial court concluded that racial and ethnic prejudice also played a part. *See McAninch,* 994 F.2d at 1388 (affirming trial court's conclusion that hatred was motivator of crime despite evidence that psychological problems could have been the cause).  The Prices knew that Capouano was Jewish, and when they vandalized his home they painted swastikas and anti-semitic and racist remarks designed to strike at his religious heritage.  The Prices also made repeated anti-semitic remarks about Capouano and Jews in general.  While the Prices counter that any racist and anti-semitic conduct was impulsive and isolated, there is evidence that the Prices put some thought into

---

[9]While we do not reach the issue here, we note that other circuits have allowed departures based on racist or anti-semitic motivation. *See, e.g., United States v. McAninch,* 994 F.2d 1380, 1387-89 (9th Cir.) (holding that defendant's racist motivation is valid ground for departure because it is not otherwise treated in guidelines), *cert. denied,* --- U.S. ----, 114 S.Ct. 394, 126 L.Ed.2d 342 (1993); *United States v. Salyer,* 893 F.2d 113, 115-16 (6th Cir.1989) (race of victim could be considered under U.S.S.G. § 3A1.1 where defendant tailored actions to exploit special vulnerability of African-American family to cross burning).

what they did and how they did it.  *See United States v. Sanders,* 41 F.3d 480, 485 (9th Cir.1994) (holding that racist and anti-semitic letters, though short and simplistic, evidenced deliberation where defendant had to look up addresses and tailor each message to the group he was attacking), *cert. denied,* --- U.S. ----, 115 S.Ct. 2010, 131 L.Ed.2d 1009 (1995).

As for the proposed mutilation of IRS agent Dwight Huff, the Sentencing Commission did not adequately provide for such a grisly variety of the crime when it designed the applicable guidelines for conspiracy, solicitation, or murder-for-hire. *See* U.S.S.G. § 5K2.8 (allowing departure where defendant's conduct was unusually heinous, cruel, brutal, or degrading to victim).  As the trial court concluded, these crimes were more depraved than the typical cases the guidelines were designed to cover, so that a departure based in part on the proposed mutilation of Huff was warranted. Further, we find no clear error in the trial court's underlying factual findings.  John Price explicitly ordered Huff's "well-damaged carcass" in a taped conversation with the FBI.

b. Risk of harm to innocent third parties

The trial court held that the potential for "injury even to the point of death" to a multitude of unknown victims as a result of the defendants' criminal activity was a factor not adequately considered in the applicable guidelines.  (R. 31 at 104.)  The factual predicate to this holding was the probability of injury to innocent bystanders had the scheme to blow up Leon Capouano's law office succeeded.  The Prices argue that any risk to bystanders was already taken into account by the guidelines.

We first examine the guidelines to determine whether the district court correctly concluded that the danger to innocent bystanders from a bombing was not adequately considered. Reading U.S.S.G. § 2K1.4, we agree with the Prices that the risk of harm to third parties is already incorporated into the guideline applicable to property damage caused by explosives. The presentence investigation reports explicitly applied guideline § 2K1.4(a)(1), which provides for a greater base offense level where the crime "created a substantial risk of death or serious bodily injury *to any person other than a participant in the offense*...." (emphasis added). This includes people caught inside a building as well as bystanders injured in a blast. There may well be bombing cases involving risks to third parties of a kind outside the "heartland" of such cases. But the government points to nothing in the record demonstrating that this is such a case. As a result, we hold that the trial court misapplied the guidelines to the extent that the risk to third parties was double-counted; the court's reliance on the harm to innocent bystanders was thus misplaced as a ground for departure.

c. Extreme psychological injury to Kenny Price

The Prices also challenge the court's reliance on its finding of extreme psychological harm to several of the victims, most notably Kenny Price, as a basis for upward departure. The Prices do not question the court's capacity to increase their sentences where their victims suffered severe psychological injury. *See* U.S.S.G. § 5K2.3. They only argue that the evidence introduced by the government did not show that Kenny Price or the other victims

suffered an "injury much more serious than that normally resulting" from being a target for murder. *See* U.S.S.G. § 5K2.3, p.s. Our review, then, is limited to reviewing the court's factual findings for clear error.

To be sufficiently severe to warrant a departure, there must be "a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim" likely to last for an extended duration and to manifest itself by physical or psychological symptoms, or by changes in behavior. U.S.S.G. § 5K2.3. *See United States v. Wilson,* 993 F.2d 214, 218 (11th Cir.1993) (stating that "[w]e doubt that feelings of foolishness, anger, or disappointment are so far beyond the heartland of fraud offenses" to rise to the level of extreme psychological harm). While we have never decided the extent of harm needed to show "extreme psychological injury," other circuits have affirmed trial courts that departed from the guidelines based on factual findings similar to those in this case. *See, e.g., United States v. Anderson,* 5 F.3d 795, 804-805 (5th Cir.1993) (upholding departure based on letter of victim describing "her ordeal and its effects on her life"), *cert. denied,* --- U.S. ----, 114 S.Ct. 1118, 127 L.Ed.2d 428 (1994); *United States v. Miller,* 993 F.2d 16, 21 (2d Cir.1993) (upholding departure where victim was afraid to answer phone, open mail, or stay in New York area).

Upon review of the presentence investigation reports (PSIs), we cannot say that the trial court clearly erred in finding that several of the victims suffered severe psychological injuries of the type addressed by U.S.S.G. § 5K2.3. The PSIs state that this

ordeal was very traumatic for Kenny Price. He attended counseling sessions, and at one point contemplated suicide. Kenny suffered from depression, and he stated that he no longer felt safe in his home or when he went anywhere. IRS agent Dwight Huff stated in the PSIs that his whole family changed their lifestyle to be "extra cautious of their surroundings," and he also said that his children were psychologically affected. Leon Capouano and David Hawthorne installed security systems in their houses and also restricted their activities outside their homes after the incidents at issue in this case. We find no error in the trial court's reliance on this evidence of extreme psychological injury as a basis for upward departure under U.S.S.G. § 5K2.3.

d. Reasonableness of the two-level upward departure

Our final task in weighing the trial court's decision to depart is to evaluate the overall departure for reasonableness. *Dailey,* 24 F.3d at 1325. The trial court did not separately assign a departure level to each ground in ordering an overall departure of two levels. In light of our determination that one of the three grounds for the departure was already considered in the relevant guidelines, we are unable to say that the overall departure would have been the same based only on the other two grounds. *See Williams v. United States,* 503 U.S. 193, 202-03, 112 S.Ct. 1112, 1120-21, 117 L.Ed.2d 341 (1992). Therefore, we vacate the sentence and remand to the district court for resentencing consistent with this opinion.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the Prices' convictions;

we VACATE their sentences and REMAND for resentencing.

CONVICTIONS AFFIRMED;  SENTENCES VACATED and REMANDED for RESENTENCING.